In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3973

Chicago District Council of
Carpenters Pension Fund, et al.,

Plaintiffs,

v.

K&I Construction, Inc.,
Defendant/Third-Party

Plaintiff-Appellant,

v.

Chicago and Northeast Illinois
District Council of Carpenters, et al.,

Third-Party Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 C 6769--John A. Nordberg, Judge.

Argued February 21, 2001--Decided February 23, 2001/*


   Before Posner, Kanne, and Diane P. Wood,
Circuit Judges.

   Diane P. Wood, Circuit Judge.  This case
arises out of a dispute between the
Chicago District Council of Carpenters
Pension, Welfare, and Apprentice and
Trainees Program Trust Funds (the Funds)
and K&I Construction, Inc. (K&I) over the
fringe benefits K&I was required to pay
to the Funds on behalf of its employees,
who are members of the Chicago Northeast
Illinois District Council of Carpenters
and its local unions (the Union). The
Funds sued K&I to recover contributions
that were due; when the Union responded
with a strike in support of the Funds,
K&I filed a third-party complaint against
the Union in which it asked for an anti-
strike injunction under the Supreme
Court's decision in Boys Markets, Inc. v.
Retail Clerks Union, Local 770, 398 U.S.
235 (1970). The district court refused to
grant the injunction, and K&I appealed.
After hearing oral argument, we issued an
order affirming the district court's
decision. The present opinion explains

how and why we reached that conclusion.

I

K&I is a subcontractor for homebuilders in the Chicago area; it and the Union are parties to a collective bargaining agreement that requires K&I to pay certain contributions to the Funds. On October 17, 2000, the Funds submitted to K&I an audit report claiming that between January of 1997 and December of 1999, K&I failed to forward almost $800,000 in required fringe benefit contributions. K&I disputed that it owed the contributions, and so the Funds filed suit. On October 31, 2000, the Union went on strike in support of the Funds' fringe benefit claim.

Fearing that the strike would cost it important contracts, K&I filed its third-party complaint against the Union and sought to enjoin the labor action. Relying on Boys Markets, K&I argued that it was entitled to an injunction because, under the terms of the collective bargaining agreement, the dispute over fringe benefit contributions was a mandatory subject of arbitration between K&I and the Union. The district court disagreed and denied K&I's motion, and we affirmed by order.

II

A preliminary injunction is an extraordinary remedy that should not be granted unless the movant, by a clear showing, carries the burden of persuasion. Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (per curiam). In a typical case, the plaintiff initially must establish a better than negligible chance of succeeding on the merits and the inadequacy of legal remedies. If the plaintiff carries this burden, then the district court balances the harm the injunction would impose on the defendant against the injury the plaintiff would suffer without the injunction. Boucher v. School Bd. of the School Dist. of Greenfield, 134 F.3d 821, 824 (7th Cir. 1998). In labor cases, however, the rules are somewhat different, because of additional statutory restrictions against the issuance of injunctions.

Two statutes influence the availability of the kind of injunction K&I wants: the

Norris-LaGuardia Act (NLA), 29 U.S.C. sec. 101 et seq., which imposes strict limits on the ability of courts to enjoin labor disputes; and the Labor Management Relations Act (LMRA), which establishes a strong policy in favor of arbitrating labor-management disputes, 29 U.S.C. sec. 173(d). In Boys Markets, the Supreme Court addressed the tension that can arise between these two enactments. The Court recognized that one of the most important benefits employers gain when they agree to mandatory arbitration is the avoidance of strikes and other disruptive labor actions. In order to ensure that employers have an incentive to agree to arbitration (which, to theextent it occurs, fosters the social interest in industrial peace, recognized by the Supreme Court in N.L.R.B. v. Seven-Up Bottling Co. of Miami, 344 U.S. 344 (1953)), the Court determined that it was necessary to recognize a narrow exception to the NLA's anti-injunction provisions. If the employer has contractually obligated itself to arbitrate a given dispute, by the same token that employer must be able to enjoin the union from striking over that dispute. Boys Markets accordingly held that a court may "issue [an] injunctive order [if] it first holds that the contract does have [the] effect" of binding both parties to arbitrate the dispute at issue and that "an injunction would be warranted under ordinary principles of equity." 398 U.S. at 254 (emphasis in original) (quoting Sinclair Refining Co. v. Atkinson, 370 U.S. 195, 228 (1962) (Brennan, J., dissenting)). It is in that sense that an employer seeking to enjoin a labor action is subject to an extra burden: it must both satisfy the normal requirements for an injunction and also demonstrate that the contract language binds the union to arbitrate the dispute that precipitated the strike.

After Boys Markets, the Court underscored that the relevant issue is not simply whether the labor action violates the collective bargaining agreement, but more specifically whether the dispute that gave rise to the labor action was also one that the parties specifically agreed would be the subject of mandatory arbitration. As the Court said in Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Ass'n, 457 U.S. 702 (1982), "in agreeing to

broad arbitration and no-strike clauses, the parties do not bargain for injunctive relief to restore the status quo pending an arbitrator's decision on the legality of the strike under the collective bargaining agreement, without regard to what triggered the strike. Instead, they bargain only for specific enforcement of the union's promise to arbitrate the underlying grievance before resorting to a strike." Id. at 723. A sympathy strike, for example, may be a violation of the collective bargaining agreement's no-strike clause, but it may not be enjoined pending arbitration of the propriety of the strike unless the union specifically obligated itself to arbitrate the issue that caused the walkout. See Buffalo Forge Co. v. United Steelworkers, 428 U.S. 397 (1976); Local Lodge 1266, International Ass'n of Machinists v. Panoramic Corp., 668 F.2d 276, 280-81 (7th Cir. 1981).

Turning to the merits of K&I's claim, our first task is to identify the dispute that gave rise to the Union's strike. It is whether K&I's alleged failure to contribute $800,000 to the Funds violated any duty it had to the Funds or the union members. To succeed in its quest for an injunction, K&I must demonstrate that the CBA requires the Union to arbitrate this dispute between K&I and the Funds; it is not enough to show that the CBA prohibits the Union from striking while K&I and the Funds are sorting out their differences. (There is no dispute that if the Union were obligated to arbitrate trust fund disputes, the CBA no-strike clause would prohibit the Union from striking here.) The question whether K&I has met this burden turns on the proper interpretation of the collective bargaining agreement, which itself is an issue for which our review is plenary. International Ass'n of Machinists & Aerospace Workers, Progressive Lodge No. 1000 v. General Elec. Co., 865 F.2d 902, 905 (7th Cir. 1989). Only if we concluded that the CBA requires the Union to arbitrate this trust fund dispute would we need to consider whether this case should be remanded for the district court to consider the equities of the requested injunction, or whether we could review the district court's decision denying the injunction under the usual deferential abuse of discretion standard, if the record is already clear enough.

Several provisions of the CBA are relevant here. Article XVIII, titled "Settlement of Disputes," states:

18.1 Except as provided in Sections 12.13, 13.11, 14.11, 27.1, 28.2, 33.1, 34.1, 35.1, and 36.1 of the Agreement, any dispute as to the proper interpretation of this Agreement shall be handled in the first instance by a Representative of the UNION and the EMPLOYER, and if they fail to reach a settlement . . . it shall be referred to a Board of Arbitration composed of one (1) person appointed by each party, the two (2) so appointed to select a third member.

18.2 Except as provided in Sections 12.13, 13.11, 14.11, 27.1, 28.2, 33.1, 34.1, 35.1, and 36.1 of this Agreement, the Board of Arbitration shall have jurisdiction over all questions involving the interpretation and application of any Section of this Agreement.

18.3 . . . There shall be no work stoppage during arbitration.

Each of the relevant exempted sections to which Sections 18.1 and 18.2 refer (e.g., 12.13, 13.11, etc.) is contained within CBA articles that pertain to K&I's duty to make contributions to the Funds. So, for example, Article XII relates to the Health and Welfare Fund and Article XIII relates to the Pension Fund. Each of the referenced sections is at the end of its article and contains essentially the same language. Section 12.13 is typical:

The collection of amounts due under this Article shall not be subject to the Settlement of Disputes procedure established in Article XVIII.

Each of the cited articles also contains language to the effect that "the EMPLOYER agrees to be bound by the Agreement and Declaration of Trust establishing the [Trust Fund]" and that contributions "shall be made on the dates and in the manner prescribed by the Trust Agreement." See, e.g., Article XII, Sections 12.2 & 12.3. (Neither party considered it necessary to include the trust agreements in the record; they factor into our analysis only insofar as we can deduce the relevant terms from other evidence properly before us; as we

note later, K&I bears the risk of any re maining uncertainty about the terms.)

Before we interpret this contractual language, there are two questions of law that we need to address. The first is what legal standard a court considering a Boys Markets injunction should apply when the parties dispute whether the mandatory arbitration provision covers the dispute that gave rise to the strike. The district court followed the Sixth Circuit's rule, which is that no Boys Markets injunction may issue if the union makes a "colorable claim" that the contract language excludes the underlying dispute from arbitration. See Allied Systems Ltd. v. Teamsters Nat'l Auto. Transporters Indus. Negotiating Comm., Local Union 327, 179 F.3d 982, 988-89 (6th Cir. 1999). K&I argues that the district court should have interpreted the CBA according to established principles of labor contract law and made a determination whether the underlying dispute was subject to arbitration.

We agree in principle with K&I. To see why, we begin with three legal propositions that are not in dispute. First, as a rule, whether a labor-management dispute is a mandatory subject of arbitration is a question for the courts. First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995); AT&T Technologies, Inc. v. CommunicationsWorkers, 475 U.S. 643, 649 (1986) ("Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator."); Local Union 1393 Int'l Bhd. of Elec. Workers v. Utilities Dist. of W. Ind. Rural Elec. Membership Coop., 167 F.3d 1181, 1183-84 (7th Cir. 1999). Second, courts determine whether to compel parties to arbitrate by interpreting the relevant language of their collective bargaining agreement in light of well-worn principles of labor contract interpretation, including the rule that where the agreement contains a mandatory arbitration provision, there is generally a presumption in favor of find ing arbitrability. Local Union 1393, 167 F.3d at 1183. Finally, from Boys Markets and Buffalo Forge, we know that once a court holds that an issue that gave rise to a strike is a subject of mandatory arbitration, the employer is entitled to

enjoin the strike -- provided that the equities favor an injunction.

These three propositions leave little room for the Sixth Circuit's "colorable claim" rule. That rule would require courts to apply a different standard of labor contract interpretation when deciding arbitrability for purposes of a Boys Markets injunction from the standard applied when deciding whether to issue an order to arbitrate. A court could only "hold" that a dispute must be arbitrated for purposes of Boys Markets if no colorable claim to the contrary could be made, while whether the parties were actually ordered to arbitrate would be determined in light of established principles of labor contract interpretation. We can find no evidence that the Supreme Court has created such inconsistent standards. On the contrary, in Gateway Coal Co. v. United Mine Workers, 414 U.S. 368 (1974), the Court applied standard principles of labor contract interpretation, including the presumption in favor of arbitrability, in concluding that the Third Circuit erred in reversing the grant of a Boys Markets injunction. 414 U.S. at 380 n. 10. That the Court took this approach is not surprising when one considers the practical consequences of having inconsistent standards. Because the "colorable claim" test is considerably less favorable to arbitration, courts, for reasons other than the equitable ones recognized in Boys Markets, would sometimes be required to deny employers the benefit of their bargain to arbitrate by requiring arbitration but permitting unions to continue striking.

Allied Systems relies for its rule upon an earlier Sixth Circuit opinion, Waller Bros. Stone Co. v. United Steelworkers, 620 F.2d 132 (6th Cir. 1980), in which the court explained that no Boys Markets injunction could issue where the arbitrability of the dispute was a "threshold question[ ] pos[ing] difficult problems of contract interpretation," be cause in Buffalo Forge the Supreme Court warned against using Boys Markets injunctions to "usurp" the role of thearbitrator. Waller Bros. Stone Co., 620 F.2d at 136. The problem with this argument, and the reason that the usurpation discussion in Buffalo Forge is not on point, is that the district court,

and not the arbitrator, is normally the entity charged with deciding the question whether the dispute that gave rise to the strike is subject to arbitration. (That is the case with this CBA; we express no opinion on the more unusual situation in which the parties have given the arbitrator the authority to determine arbitrability as well, though we note that the Supreme Court has imposed a significantly different standard of certainty on courts before they are to come to such a conclusion. See First Options, 514 U.S. at 945.) There is thus no threat of usurpation when the court is deciding only whether a certain issue is arbitrable; even if the issue of arbitrability raises a difficult question of labor contract interpretation, that is not enough to deny a Boys Markets injunction.

Others among our sister circuits are less reluctant to evaluate the merits of the contract interpretation dispute when a Boys Markets injunction is at issue. They require the court to conduct a "preliminary interpretation" of the collective bargaining agreement in light of the surrounding circumstances. National Rejectors Industries v. United Steelworkers, 562 F.2d 1069 (8th Cir. 1977); Elevator Mfrs' Ass'n v. Local 1, Int'l Union of Elevator Constructors, 689 F.2d 382 (2d Cir. 1982). We think it is appropriate to go even a step further and require that, to the extent possible on the record before it, the district court should resolve the arbitrability issue if that can be done purely as a matter of law. If there are contractual ambiguities that would require further proceedings, then the court should conduct the kind of preliminary interpretation used by the Second and Eighth Circuits. Under Boys Markets, the burden is on the employer to show that the issue is arbitrable.

The second issue raised by the parties concerns the relevance of the presumption in favor of arbitrability to the dispute in this case. The Union cites Schneider Moving & Storage Co. v. Robbins, 466 U.S. 364 (1984) for the proposition that there is no presumption that trust fund disputes are subject to mandatory arbitration. K&I contends that Schneider's holding was narrower, negating the presumption only with respect to the question whether trust

funds intended to be bound to arbitrate their disputes with employers under the terms of a collective bargaining agreement. We need not take sides on the proper interpretation of Schneider in the present situation, because even if it were available, the arbitrability presumption would not help K&I here.

No court would need to resort to the arbitrability presumption unless it found the contractual language genuinely ambiguous--ambiguous in the same sense that would entitle the parties to present external evidence to shed light on the parties' true intentions. Moriarty v. Svec, 164 F.3d 323, 331 (7th Cir. 1998). And there is nothing about an arbitration clause or any applicable presumptions that changes the initial process of deciding whether the contract is or is not ambiguous. An employer's initial burden under Boys Markets is thus just the same as the initial burden faced by any party who wishes to convince a court that the plain language of a contract cannot stand on its own: it must show that the language of the arbitration clause is susceptible to more than one reasonable interpretation, including an interpretation under which it covers the dispute that gave rise to the labor action. As we will now explain, K&I has not met this burden.

K&I contends that the language from Article XVIII can reasonably be read to require the Union to arbitrate a dispute over trust fund contributions. It interprets the language in Sections 18.1 and 18.2 as covering all fund contribution disputes except those over "[t]he collection of amounts due" to the Funds, which it thinks means only disputes over the process of collecting fringe benefit contributions. Under this approach, disputes over the determination of the amount due, in contrast, must be arbitrated under the broad language of Article XVIII. (Evidently K&I thinks that ascertaining the amount one must pay is not part of the collection process.) The Union, on the other hand, finds these distinctions unworkably fine; it contends that Article XVIII's arbitration clause was not intended to apply to any trust fund contribution disputes and that the exemption language can only reasonably be interpreted as a statement of this intention.

We recognize that in some cases a collective bargaining agreement, reasonably interpreted, may require a union to arbitrate trust fund disputes, see Jaffee v. Shanin Co., 763 F.Supp. 286 (N.D.Ill. 1991), but this is not such a case. It is easiest to see why if we start with the fact that the CBA incorporates by reference the terms of the Funds' trust agreements. As a result, even though only K&I and the Union are signatories to the CBA, the CBA contractually establishes K&I's relationship to both the Union and the Funds. Any proposed interpretation of the CBA must therefore take account of this fact.

And it is here, already, that K&I's proposed interpretation of the CBA becomes problematic. K&I is litigating with the Funds over the same $800,000 dispute that it insists must be arbitrated with the Union under the CBA. K&I conceded the validity of that suit at oral argument. It is necessarily arguing, therefore, that the CBA (including the Funds' incorporated trust agreements) can reasonably be interpreted as requiring the Union to arbitrate the dispute with K&I while permitting the Funds simultaneously to litigate the same dispute in federal court. The exemption language of Article XVIII suggests that the agreement did no such thing, and we see no other evidence in the CBA that the parties intended to create a bifurcated system of dispute resolution and to run the risk of inconsistent, legally binding outcomes. At the least, we would not interpret a contract to require such a cumbersome and potentially chaotic outcome absent a clear expression of intent. Cf. Pipe Fitters' Welfare Fund, Local Union 597 v. Mosbeck Indus. Equipment, Inc., 856 F.2d 837, 840 (7th Cir. 1988) (requiring clear expression of intent to have union arbitrate on behalf of trust funds).

This point would have less force if it were possible for the Funds to participate in the arbitration, but nothing before us suggests that this can occur. Article XVIII makes no provision for the Funds to be a party to an arbitration between K&I and the Union, and we see no evidence elsewhere of any such agreement on the part of the Funds. Excluding the Funds from the arbitration

process makes good sense if disputes in which the Funds have an interest are exempted from arbitration; that way, any disputes could be filed in the appropriate court and all interested parties would be able to participate in the litigation.

The specific language of the CBA is no more helpful to K&I. The reasonableness of a proposed interpretation of contractual language requires consideration of the contract as a whole, including terms incorporated by reference. Here, the relevant articles of the CBA incorporate by reference the Funds' trust agreements. One can deduce from the CBA that those agreements have something to say about the process of making trust fund contributions, and that they may provide insights into how the parties to the CBA intended to resolve disputes over such contributions. That is why in similar situations both the Supreme Court and this court have carefully considered the content of both CBAs and trust agreements in determining the parties' intent with respect to the arbitrability of trust fund disputes. Schneider, 466 U.S. at 374; Pipe Fitters' Welfare Fund, 856 F.2d at 840. K&I, however, failed to make these agreements part of the record. Given that it was K&I's burden to prove the reasonableness of its position in light of the contract as a whole, this failure alone strikes a serious blow against its effort to qualify for a Boys Markets injunction.

Even assuming away this evidentiary problem, the plain language of the CBA does not support K&I's position. There is no language specifically stating that the Union must arbitrate a dispute between the company and the Funds about trust fund contributions, and there certainly is no express indication that it must do so while the Funds are litigating the same dispute. (Why the Union would need to be asserting the Funds' right in an arbitration proceeding is an interesting question, the answer to which also cuts against K&I's efforts.) Instead, the CBA arbitration provisions exclude from arbitration all trust fund disputes involving "[t]he collection of amounts due under" the trust fund-related articles of the CBA.

K&I has tried to inject ambiguity into

those words, but we find its efforts unsuccessful in the end. The key phrase, in light of the language of the articles addressing the trust funds, supports the conclusion that the parties meant to exclude all trust fund disputes from arbitration. The trust-fund-related articles cover all the details (directly and by incorporation of the trust agreements) of calculating and making fund contributions without providing for any express distinctions between the various stages of the contribution process. No distinction is made between the determination of the amounts due to the Funds and the process by which those amounts are to be collected. The natural reading of the phrase "collection of amounts due under this Article" is thus as a general exemption of all funding disputes arising under the various articles.

K&I's proposed reading makes no practical sense, either. Under K&I's interpretation, the exemptions in Article XVIII in effect would only clarify that there is no need to arbitrate the collection of an arbitral award. If K&I's reading of the contract is correct, the parties drafted the exemption language only to clarify that if, after an arbitrator determined the fringe benefit contribution amount owed to the Funds, K&I refused to pay, or refused to pay in the manner the arbitrator decreed, the parties would not need to arbitrate K&I's refusal to honor the award. The notion that this was the parties' concern borders on the absurd, especially in light of the perfectly sensible alternative conclusion that results from the Union's interpretation of Article XVIII and the phrase "collection of amounts due under this Article."

In the final analysis, we have no trouble concluding that the language of the CBA unambiguously establishes that the arbitration provisions in Article XVIII were not intended to cover disputes between K&I and the Funds. This means that we need not concern ourselves with any presumption favoring arbitration, and we leave further development of that topic to another day. The only reasonable interpretation of this agreement is the one the district court adopted, under which the phrase "[t]he collection of amounts due under this Article shall not

be subject to the Settlement of Disputes procedure established in Article XVIII" has the effect of exempting from arbitration disputes like the one that gave rise to the Union's strike.

III

Because the CBA here cannot reasonably be read to require the Union to arbitrate the trust fund dispute between K&I and the Funds, this case does not fall within the narrow set of circumstances under which a Boys Markets injunction may be issued. We thus Affirm the district court's denial of a preliminary injunction against the strike.

FOOTNOTE

/* On February 23, 2001, we issued an order affirming the district court's denial of K&I Construction, Inc.'s motion for a preliminary injunction, with an indication that an explanation would follow in due course. This opinion provides that explanation.