# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 04-2482

R.J. CORMAN DERAILMENT SERVICES, LLC,

*Plaintiff-Appellee,*

v.

INTERNATIONAL UNION OF OPERATING ENGINEERS,
LOCAL UNION 150, AFL-CIO,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 C 0471—**Ruben Castillo**, *Judge.*

_____

ARGUED NOVEMBER 10, 2004—DECIDED SEPTEMBER 2, 2005

_____


Before POSNER, WOOD, and EVANS, *Circuit Judges.*

WOOD, *Circuit Judge.* We return in this appeal to the dispute between R.J. Corman Derailment Services, LLC, and Local 150 of the International Union of Operating Engineers over the arbitrability of certain wage grievances that arose under an expired collective bargaining agreement. When the case was last here, we found that the district court's entry of judgment on the pleadings compelling arbitration was premature, because Local 150 had not yet filed its answer to Corman's complaint. See *R.J. Corman Derailment Servs. v. Int'l Union of Operating Eng'rs, Local 150,* 335 F.3d 643 (7th Cir. 2003) (*Corman I*).

On remand, the district court ultimately found that Local 150's attempt to invoke arbitration was untimely and therefore that the parties' dispute was not arbitrable. We affirm.

# I

Corman provides emergency services for railroads and industries that operate their own railroad facilities. Its services include removing derailed cars, repairing damaged sections of track and cleaning up any hazardous spills caused by a derailment. Between derailments, Corman's employees work at its facilities, where it stores and maintains equipment used at the derailment sites. From 1992 through 1999, Local 150 served as the exclusive bargaining representative for Corman's employees at its Gary, Indiana, facility. During this time, Corman and Local 150 were parties to three collective bargaining agreements (CBAs), the last of which was in effect from December 19, 1996, through December 19, 1999. Although the parties began negotiations for a new agreement, these efforts ended without success in early June 2000. At the end of June, Corman closed its Gary facility and terminated those employees.

According to Local 150, the disputes it wishes to submit to arbitration came to its attention during the negotiations for a successor agreement. In February 2000, Corman provided the Union with payroll records listing bargaining unit employees at the company from late December 1998 through late December 1999. After reviewing these documents, Dave Fagan, Local 150's Organizer and Business Representative, suspected that Corman had not complied with the wage provisions of the 1996 CBA. The CBA obligated Corman to pay bargaining unit members according to a three-tiered hourly wage schedule that varied by type of work: the regular wage rate was $12.35; the

straight-wreck work rate was $16.25; and the overtime wreck rate was $22.65. This schedule did not, however, apply to "casual employees," which the CBA defined as "employees hired for a specific customer project." While the CBA did not ban casual employees from future employment on customer projects, no casual employee could be employed to reduce, or prevent an increase in, the hours worked of any bargaining unit employee or as a means to prevent an increase in the number of such employees. An employee lost the status of a casual employee if she was retained for work that could be performed only by a regular employee. In that case, Corman was required to pay the former casual worker according to the CBA's wage provisions. From the payroll records, Fagan believed that Corman had underpaid certain employees by improperly classifying them as casual employees.

At the time that Fagan discovered these wage discrepancies, no employee had complained about them to the Union or filed a grievance with Corman. A particularly alert employee might have done so, given the fact that Corman paid its employees either weekly or bi-weekly and a pay stub detailing the number of hours worked and the total amount paid accompanied each paycheck. Fagan informed Steve Cisco, Local 150's Secretary, of his suspicions, but he did not file a grievance at that time. Instead, on February 22, 2000, with Cisco's authorization, Fagan requested that a wage audit be conducted in conjunction with the fringe benefits audit the Trustees of the Midwest Operating Engineers Pension and Benefits Funds (The Funds) had already initiated. (The Funds suspected that Corman had failed to make the required contributions to its ERISA plan, again by manipulating who was a "casual" employee and who was regular; they sued to recover the alleged shortfalls. See *Dugan v. R.J. Corman R.R. Co.*, 344 F.3d 662 (7th Cir. 2003).) On July 25, 2001, the auditor issued its report, which confirmed Fagan's belief that certain employees had

been classified improperly as casual employees and thus had been underpaid.

As we noted in *Corman I*, Article IX of the 1996 CBA provides a four-step procedure for filing grievances:

> Step one requires an aggrieved employee orally to notify her union steward and her supervisor of a grievance within ten working days of the grievance's occurrence. If after five additional working days the grievance is not resolved, step two requires the employee to submit a signed copy of her grievance in writing to the Union's Business Representative and to Corman or its representative. Corman then has five working days to respond in writing to the grievance. If this additional step fails to resolve the employee's grievance, step three provides for the submission of the complaint to a grievance committee. If within ten additional working days the committee does not resolve the grievance, the aggrieved employee may proceed to step four and submit a written demand for arbitration. This written demand must be made within forty-five days of the initial occurrence.

335 F.3d at 645-46.

On September 12, 2001, Local 150 sent a letter to Corman stating that it was invoking step two of the grievance procedure for wage underpayments of certain employees. Corman responded a week later, asserting that it was not obligated to entertain or respond to any claimed grievance because there was no agreement in effect between the parties. It also alleged that Local 150 had not followed the CBA's grievance procedure and that the letter was "ineffective to initiate the long-expired grievance process." On October 30, Local 150 formally demanded arbitration pursuant to step four of the grievance procedure. Corman responded on November 7, refusing to arbitrate the dispute because the grievance was untimely and the Union did not follow the grievance procedures. On January 18, 2002,

Corman filed this action in district court under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 *et seq.*, seeking declaratory and injunctive relief from Local 150's demand for arbitration. Before Local 150 filed its answer to the complaint, the court granted judgment on the pleadings in favor of Local 150. Corman appealed, and we concluded that the judgment ordering arbitration was premature. See *Corman I*, 335 F.3d at 649. We identified a number of issues that had to be resolved in order to determine whether the dispute was arbitrable: whether the CBA remained in effect during the parties' negotiations for a new agreement, whether the Union could have filed a grievance during the life of the agreement, and most importantly, whether the grievances were timely. *Id.* at 649-51.

On remand, the district court granted summary judgment in favor of Corman. It found that although the events triggering the grievances occurred before the CBA expired (which standing alone supported arbitrability), the dispute was nonetheless not arbitrable because Local 150 did not file the grievances within a reasonable time after the expiration of the agreement. Critically, Local 150 failed to present evidence showing that the employees did not know of the underpayments at the time they were paid. Alternatively, even if the employees could not have grieved the wage discrepancies as they arose, Local 150 could have filed the grievances in February 2000, when Fagan reviewed Corman's payroll records. Finally, the court reasoned that even if it was rational for Local 150 to delay the filing of the grievances until after the wage audit report, the two-month wait failed to comply with the timing requirements set forth in the CBA. Under the CBA, the parties intended a request for arbitration to be brought within 45 days after discovery of the grievance. Any way one looked at the matter, the district court concluded, Local 150 waited too long.

## II

We review the district court's grant of summary judgment *de novo*. See *Int'l Bhd. of Elec. Workers, Local 176 v. Balmoral Racing Club, Inc.*, 293 F.3d 402, 404 (7th Cir. 2002). Both parties had moved for summary judgment; to the extent that Local 150 challenges the court's decision to grant Corman's motion, we construe the record in the light most favorable to the Union. To the extent that Local 150 asserts that the court erred in refusing to grant its own motion, we view the record in the light most favorable to Corman. *Id.* The duty to arbitrate is "a creature of the collective-bargaining agreement and [a] party cannot be compelled to arbitrate any matter in the absence of a contractual obligation to do so," *Nolde Bros., Inc. v. Local No. 358, Bakery & Confectionary Workers Union*, 430 U.S. 243, 250-51 (1977). Nevertheless, a party's obligation to arbitrate can survive the expiration of the contract in limited circumstances. *Id* at 251. In *Nolde*, the Supreme Court held that "where the dispute is over a provision of [an] expired agreement, the presumptions favoring arbitrability must be negated expressly or by clear implication." *Id.* at 255. This rule also applies to an action that "involves facts and occurrences that arose before expiration, where an action taken after expiration infringes a right that accrued or vested under the agreement, or where, under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement." *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 206 (1991).

Local 150 argues that a court's inquiry into the arbitrability of a post-expiration grievance begins and ends with *Litton*. The rule in its view is simple: where the dispute arises under the agreement, it is presumed to be subject to the agreement's arbitration provision. At that point, everything else is for the arbitrator to decide. In particular, Local 150 argues that the question whether a

grievance is timely is a procedural question within the arbitrator's competence. Thus, it concludes, the district court erred as a matter of law when it found that the underlying dispute was not arbitrable because it was not filed within a reasonable amount of time.

In *Nolde*, the Supreme Court hinted at the possibility that the untimely assertion of a post-expiration grievance extinguishes the presumption of arbitrability. 430 U.S. at 255 n.8 ("[W]e need not speculate as to the arbitrability of post-termination contractual claims which, unlike the one presently before us, are not asserted within a reasonable time after the contract's expiration."). This court has also recognized the potential importance of the time factor in determining whether a post-expiration dispute is arbitrable. See *Local 703, Int'l Bhd. of Teamsters v. Kennicott Bros. Co.*, 771 F.2d 300, 303 (7th Cir. 1985). In *Kennicott*, we faced the question whether a post-contract discharge and severance pay dispute that arose more than six months after an agreement had expired were subject to arbitration and concluded that they were not. *Id.* at 304. In so ruling, we declined to "read the *Nolde* presumption of arbitrability to persist indefinitely after expiration." *Id.* at 303. As we explained, "[a]lthough it may be reasonable to presume that parties intend to arbitrate grievances arising shortly after the expiration of a contract, the presumption weakens as the time between expiration and grievance events increases." *Id.*

Local 150 contends that *Kennicott* is inapplicable because it involved a grievance that was triggered by events occurring after the contract's expiration whereas here, the wage underpayments occurred during the life of the contract. It argues that we should follow the Ninth Circuit's decision in *Goss Golden W. Sheet Metal, Inc. v. Sheet Metal Workers Int'l Union, Local 104*, 933 F.2d 759 (9th Cir. 1991), which involved a grievance that arose during the life of the contract but was initiated after the expiration of the

agreement. In *Goss*, the employer appealed the arbitration panel's award on the ground that the grievance was untimely. The Union alleged that the employer had engaged in a cover-up to prevent it from learning of the employer's breach. *Id.* at 763 n.2. Concerned that requiring a grievance to be filed within a certain time after a contract's expiration would allow an employer to evade its contractual obligations by engaging in cover-up efforts, the court held that the issue of timeliness was governed by the terms of the CBA. *Id.* at 763. ("To reach any other conclusion would allow parties to breach with impunity collective bargaining agreements during the agreements' terms as long as they successfully covered their tracks so that the discovery of any breach was postponed until after the expiration of the particular agreement.").

This is a valid concern. Requiring a grievance to be asserted within a set time after the contract's expiration could lead to inequitable results if one party acted to make it difficult for the other to discover the breach of the contract until after the prescribed time period had run out. It would also be inconsistent with *Nolde*, which was meant to prevent a party from evading its contractual obligation to arbitrate by terminating the contract before a grievance could be filed. *Nolde*, 430 U.S. at 253. Nonetheless, it remains true that at some point—two years? five years? ten years?—beyond the expiration of the CBA, it would be utterly unreasonable to presume that the parties still had an agreement to arbitrate CBA-based grievances that had grown musty with age. As we noted in *Kennicott*, the *Nolde* presumption of arbitrability does not persist indefinitely. 771 F.2d at 303. The real question is whether one party had taken action to abuse the process in the way the Ninth Circuit described.

In the absence of evidence of abuse (which we do not see here), we conclude that a post-expiration grievance must be asserted within a reasonable time after its discov-

ery—within a time, as we put it in *Kennicott,* when it is still logical to apply the *Nolde* presumption. One factor that sheds some light on the time period that is reasonable is the language of the CBA itself. Collective bargaining agreements generally call for grievances to be brought within a limited time period. The 1996 CBA between Local 150 and Corman is no exception: it establishes a 45-day period in which to invoke the grievance process, starting with the date when the events triggering the grievance occurred. The parties did not intend an unlimited time to file a grievance during the life of the contract. It would be incongruous if the same grievance were not subject to any time limitations simply because it came to light after the contract had expired.

Understood in this light, the district court's inquiry into the timeliness of the grievances was not a usurpation of the arbitrator's role. It was instead part of the process of determining whether there was an agreement to arbitrate this set of grievances at all. This distinguishes the present case from *Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79 (2002), in which the Supreme Court held that the question whether a grievance is brought within the time period permitted by an agreement to arbitrate is one for the arbitrator. The question here is how long the expired agreement to arbitrate survived. Only if the parties had agreed to allow the arbitrator to decide that threshold question would the district court have been compelled to order arbitration. But, as the Supreme Court held in *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944 (1995) (quoting *AT & T Technologies, Inc. v. Communication Workers*, 475 U.S. 643, 649 (1986)), unless there is "'clea[r] and unmistakeabl[e]' evidence" that the parties have agreed to let the arbitrator decide arbitrability, a party cannot be forced to "'arbitrate the arbitrability issue.'" *Litton*, 501 U.S. at 208 (quoting *AT & T*, 475 U.S. at 651). Here, we do not have the clear evidence called for by *First Options*. It

was therefore up to the court to decide whether the dispute was arbitrable, and that question in turn required an inquiry into the question whether it was brought too long after the CBA's expiration.

On the ultimate question of what time period is reasonable here, the parties offer only extreme positions. Corman urges us to apply the 45-day period set by the grievance procedure in the agreement itself, and it would prefer that we find that the period began running at the time the employees were paid. Local 150 counters that the Illinois limitation period for breach of written contracts, see 735 ILCS 5/13-206, providing for a 10-year period, should apply.

We find neither of these positions persuasive. Accepting Corman's position would require a court to delve too deeply into questions of the parties' compliance with the terms of the agreement, which are more properly for the arbitrator. See *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 557-58 (1964); *Beer, Soft Drink, Water, Fruit Juice, Carbonic Gas, Liquor Sales Drivers, Helpers, Inside Workers, Bottlers, Warehousemen, School, Sightseeing, Charter Bus Drivers, General Promotional Employees of Affiliated Industries, Local Union 744 v. Metro. Distrib., Inc.*, 763 F.2d 300, 303 (7th Cir. 1985). Local 150's reliance on Illinois contract law is unsatisfactory because it ignores the strong federal policy favoring the prompt resolution of labor policies. See *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 171 (1983); *United Food & Commercial Workers Local 100A v. John Hofmeister & Son, Inc.*, 950 F.2d 1340, 1346-48 (7th Cir. 1991). In *Hofmeister*, in the context of an ongoing CBA, we rejected Illinois' 10-year limitations period and found that it was appropriate to borrow the six-month statute of limitations from § 10(b) of the National Labor Relations Act, 29 U.S.C. § 160(b), for actions brought to compel arbitration under that CBA. 950 F.2d at 1348.

In the context of an expired CBA, as we have already

said, there are powerful reasons to avoid a rigid limitations period and to require only action within a reasonable time. Nonetheless, the fact that both the CBA and labor law in general favor prompt resolution of labor disputes provides guidance about what would be reasonable.

Corman contends that the employees could have brought the grievances as they occurred because it was relatively straightforward to calculate their wage rates from the pay stubs. In order to prevail, however, it was up to Corman to show that casual employees would have known that they were entitled to be paid at a higher wage rate. Their pay stubs allowed them only to check the wages they were paid against the wages Corman had promised to pay them as casual employees. The fact that they were not members of the Union meant that they did not have access to the CBA or to Union representatives and could not have known that Corman had classified them improperly. And without that knowledge, the employees could not have ascertained that they were being underpaid solely from their paychecks.

Local 150 argues that the time period should start to run from July 25, 2001, the date when the auditor issued its report confirming Fagan's suspicions about the wage underpayments. It urges that it would have been irresponsible to file a grievance any sooner, without confirming that the problem existed. The district court rejected this argument and noted that there was "no reason why Local 150, armed with payroll information in February 2000, could not have initiated the grievance process at that time and put Corman on notice that it was seeking redress for alleged wage underpayments." We agree. The fact that the payroll records might not have been enough to prove conclusively that the contract was violated does not excuse Local 150's delay; in fact, even the audit report did not go that far. The payroll records more than sufficed to put the Union on notice of the possible violation: they contained the wage rates, hours worked and wages paid for each employee in

1999. The wage audit report provided the same information, except that it also included the first eight months from 2000.

## III

Because Local 150 filed these grievances on September 12, 2001, more than 18 months after their discovery in February 2000 and long after the expiration of the CBA containing the agreement to arbitrate, we find that the delay was unreasonable. We therefore AFFIRM the judgment of the district court.

A true Copy:

       Teste:

                     _____

                     *Clerk of the United States Court of*
                         *Appeals for the Seventh Circuit*