**BULKMATIC TRANSPORT COMPANY**

v.

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN & HELPERS OF AMERICA, and Union Local 407**

No. 2:01–CV–514.

United States District Court, N.D. Indiana, Hammond Division.

July 22, 2002.

Lawrence C DiNardo, Brian W. Easley, Nikki J. Palmer, Jones Day Reavis and Pogue, Chicago, IL, for plaintiff.

Mark W Floyd, Andrea F. Hoeschen, Gerry M. Miller, Previant Goldberg Uelmen Gratz Miller and Brueggeman SC, Milwaukee, WI, William R Groth, Fillenwarth Dennerline Groth and Towe, Indianapolis, IN, Michael Murphy, International Brotherhood of Teamsters, Staff Counsel, Legal Department, Washington, DC, for defendants.

## *ORDER*

MOODY, District Judge.

In this civil action, three summary judgment motions are pending. Bulkmatic Transport Company ("Bulkmatic") seeks summary judgment against the International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America ("IBT"), and Union Local 407. Bulkmatic filed its consolidated motion on January 25, 2002. On the same day, IBT and Union Local 407 cross-moved for summary disposition. For the reasons expressed below, Bulkmatic's motion is **GRANTED IN PART** and **DENIED IN PART**; Local 407's motion is **DENIED**; and IBT's motion is **GRANTED**.

### I.  BACKGROUND

Bulkmatic is a corporation organized pursuant to Illinois law. From its nerve center in Griffith, Indiana, Bulkmatic operates approximately fifty-two trucking depots scattered over seventeen states. Of particular importance to this lawsuit are the facilities located in Cleveland and Euclid, Ohio. (*See* Compl. at ¶ 4.) Employees

at the Cleveland facility elected to collectively bargain with Bulkmatic; Local 407 represents them. Three documents comprise the collective bargaining arrangement: (1) the Master Freight Agreement and Central States Truckload and Steel Supplemental Agreement (Compl. at Ex. 1) ("Master Freight Agreement"); (2) MCLAC Central States Area Truckload and Steel Supplement (*Id.*) ("Supplement"); and (3) Rider to Central States Area Iron and Steel and Truckload Agreement (*Id.* at Ex. 2) ("Rider"). The Master Freight Agreement and Supplement are effective for the period April 1, 1998 through March 31, 2003. The Rider took effect on April 1, 1998, and expired on March 31, 2002.

On September 12, 2000, Local 407 asked the National Labor Relations Board ("NLRB") to supervise an election at the Euclid depot. (*See* Pl. Mem. in Supp. of Mot. at Ex. 1 ("Brown Decl."), ¶ 5.) On October 20, 2000, an election was conducted among eligible employees to determine whether they wished Local 407 to represent them. (*See id.*) After tabulation of the ballots, NLRB declared a majority voted in favor of unionization. NLRB certified Local 407 as the bargaining representative for all eligible Euclid employees on October 31, 2000.

A few weeks thereafter, representatives of Bulkmatic and the union commenced negotiations for a collective bargaining agreement to cover the eligible Euclid employees. (*See id.* at ¶ 6.) The parties made little progress and talks broke off. During this impasse, Michael C. Murphy, a lawyer for IBT, wrote a letter addressed to both

Butch Bingham (Bulkmatic's President) and Lawrence DiNardo (Bulkmatic's outside counsel). (*See* Brown Decl. at Ex. C.) In the letter, Murphy expresses his position that article 2, section 3(a) of the Master Freight Agreement automatically extends the Master Freight Agreement to the eligible Euclid employees.[1] Murphy concludes the correspondence by requesting that Bulkmatic extend coverage of the collective bargaining agreement covering Cleveland employees to the eligible Euclid employees "with all benefits of the Agreement and Supplements retroactive to the date of demand of recognition." (*Id.* at p. 1.) Bulkmatic's counsel responded via letter dated April 11, 2001. (*See* Brown Decl. at Ex. D.) In it, counsel conveys Bulkmatic's rejection of the "request that Bulkmatic immediately extend coverage of the Collective Bargaining Agreement presently in effect between Local 407 and Bulkmatic covering Bulkmatic's ... Cleveland facility." (*Id.* at p. 1.) In the letter, Bulkmatic contended that article 10 of the Rider eviscerated the automatic coverage mechanism embodied in article 2, section 3(a) of the Master Freight Agreement. (*See id.*)

Apparently dissatisfied with Bulkmatic's chilly response, Local 407 initiated non-judicial dispute resolution by completing a pre-printed document aptly titled "Grievance Form." (Brown Decl. at Ex. E.) It was then filed with the Ohio Joint State Committee. In the space reserved for "Grievance," where the filer is asked to "[g]ive particulars in detail including all dates and places," (*id.*) the following handwritten language appears:

---

1. When a majority of the eligible employees performing work covered by an Agreement designated by the National Negotiating Committee to be Supplemental to the National Master Freight Agreement execute a card authorizing a signatory Local Union to represent them as their collective bargaining agent at the terminal location, then, such employees

shall automatically by covered by this Agreement and the applicable Supplemental Agreements.

(Master Freight Agreement at art. 2, § 3(a).) In this Order, the court frequently refers to this provision as the "automatic inclusion clause."

The company is not responding to the MCLAC Master Freight Agreement contract which the Union has requested[;] that they showed no response to Article 2[,] section 3(a) card check authorizing a signatory local union to represent them as their collective bargaining agent at the terminal location then such employees shall automatically be covered by this Agreement and the applicable Supplemental Agreements.

(*Id.*) The form was signed by Ben Sizemore, Business Agent for Local 407. (*See* IBT Stmt. of Mat'l. Facts at 6.) This prompted Bulkmatic to resort to litigation in the federal courts. On August 31, 2001, it commenced this action. In its complaint, Bulkmatic interposed two claims. In Count One, "Bulkmatic seeks a declaration that the Area Agreement does not apply at its Euclid facility or at any facility owned and operated by the company other than the Cleveland facility, as modified by the Rider." (Compl. at ¶ 21.) In Count Two, "Bulkmatic seeks a declaration that it is not obligated to arbitrate the Union's grievance pertaining to its Euclid facility or any facility owned and operated by the company other than the Cleveland facility." (*Id.* at ¶ 25.) Two weeks later, DiNardo wrote Murphy a letter confirming that Bulkmatic received notice of the grievance lodged by Sizemore, and also made the following intimation:

> In light of [Bulkmatic's] position that there is no contractual basis for this grievance, Bulkmatic requests that the union postpone consideration of this grievance until the court has determined the applicability of the Area Agreement and its grievance procedures. If the Union proceeds with its grievance, please be advised that Bulkmatic will not participate in any grievance and/or arbitration procedures, and will file additional claims seeking to vacate any resolution or award that may be issued with respect to the grievance.

(Brown Decl. at Ex. G.) Following up on this warning shot, Bulkmatic did not appear at the grievance hearing which took place on October 2, 2001, in front of the Ohio Joint State Committee. (IBT Stmt. of Mat'l. Facts at 7.) As a result of Bulkmatic's absence, the Committee issued the following ruling: "The Employer failed to appear, the Committee invoked the provisions of art. 45 sec. 1(d)."[2] (Brown Decl. at Ex. H.)

After securing this favorable determination from the Ohio Joint State Committee, Local 407 interposed a counterclaim in this action, seeking, among other things, an order confirming the award. (*See* Local 407 Answer and Counterclaim at ¶¶ 27–36.) The parties then filed the aforementioned summary judgment motions.

## II. LEGAL STANDARD

In this procedural posture, Fed.R.Civ.P. 56 governs. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *accord Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court must construe facts and draw all reasonable inferences therefrom in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

---

**2.** Article 45, section 1(d) governs the "[f]ailure ... to ... appear at the grievance procedure at any stage."

In this district, concomitant with every summary judgment motion, "there shall be a 'Statement of Material Facts,' supported by appropriate citations to discovery responses, depositions, affidavits, and other admissible evidence, as to which the moving party contends there is no genuine issue." N.D. Ind. L.R. 56.1(a). Responding to a summary judgment includes tendering a "Statement of Genuine Issues," designed to isolate "all material facts as to which it is contended there exists a genuine issue necessary to be litigated." *Id.* Strict adherence to the local rules, as exhibited in this case by all parties, is necessary, particularly on summary judgment. This ensures that the district court can organize undisputed facts and efficiently determine whether the action requires a trial. *See Salvadori v. Franklin School Dist.*, 293 F.3d 989, 992 (7th Cir.2002) (noting adverse consequences of failing to adhere to district's rules of court); *Hedrich v. Bd. of Regents of University of Wisconsin System*, 274 F.3d 1174, 1178 (7th Cir. 2001) (supporting punishment for ignoring local rules of court); *Markham v. White*, 172 F.3d 486, 490 (7th Cir.1999) (lauding district court for enforcing local rules); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 922–23 (7th Cir.1994) (approving "no quarter" approach to local rule compliance).

## III. JURISDICTION

As a preliminary matter, the court will explore the always crucial jurisdictional requirement. *See Int'l. Union of Op. Engineers v. Rabine*, 161 F.3d 427, 430 (7th Cir.1998) ("The federal courts are courts of limited jurisdiction. We have no authority to adjudicate cases outside our purview."). According to Bulkmatic's complaint, three separate bases of federal jurisdiction support this action.[3] The court finds sufficient basis of federal jurisdiction under LMRA section 301(a).

■ LMRA section 301(a), 29 U.S.C. § 185(a), provides in pertinent part:

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce ... may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

The lynchpin of the claim is a "violation" of a labor contract. In the absence of an allegation of a "violation" of a labor agreement, this court has no jurisdiction under LMRA section 301(a) to entertain the controversy. *See Textron Lycoming Engine Div. v. Utd. Auto. Workers*, 523 U.S. 653, 661–62, 118 S.Ct. 1626, 140 L.Ed.2d 863 (1998) ("Because the Union's complaint alleges no violation of the collective-bargaining agreement, neither we nor the federal courts below have subject-matter jurisdiction over this case under § 301(a)."). Bulkmatic has made no allegation of a

---

3. In paragraph two of its Complaint, Bulkmatic represents that "[t]his Court has Federal Question Subject Matter Jurisdiction over this action pursuant to ... the Federal Declaratory Judgment Act, 28 U.S.C. § 2201." The Court of Appeals for this Circuit has repeatedly admonished lawyers for making this blatant misstatement of the law. *See, e.g., Pabst Brewing Co., Inc. v. Corrao*, 161 F.3d 434, 438 (7th Cir.1998) ("[T]he Declaratory Judgment Act, 28 U.S.C. § 2201, ... is not a jurisdictional statute."). This is not fatal because Bulkmatic has also invoked LMRA section 301 (and the flagship federal question statute codified at 28 U.S.C. § 1331, upon the applicability of which the court expresses no opinion) as alternative bases for original federal jurisdiction. Nevertheless, the court echoes the bench's increasing exasperation with carelessly drafted jurisdictional statements. For a recent manifestation of this frustration, see *Wild v. Subscription Plus, Inc.*, 292 F.3d 526, 529 (7th Cir.2002).

"violation" of the collective bargaining agreement. Rather, Bulkmatic maintains all the parties to the Cleveland agreement are in strict and full compliance with the contract. Bulkmatic, however, has filed this suit seeking a declaratory judgment, which ostensibly revolves around the question of whether Euclid employees are automatically covered under the Cleveland agreement. If the answer is "yes," then Bulkmatic has violated the contract by refusing to extend the collective bargaining agreement's terms and conditions of employment to the Euclid employees. According to *Textron Lycoming*, if a party "seeks declaratory relief from its own alleged violation," a district court can exercise jurisdiction under LMRA section 301(a). *Id.* at 658, 118 S.Ct. 1626. Although this quoted language is fairly categorized as dicta, both its source (a recent Supreme Court opinion joined by seven Justices) and its logic make secure the court's conclusion that federal jurisdiction over this action exists under LMRA section 301(a).

## IV. DISCUSSION

The fulcrum of this summary judgment motion, and in turn the entire suit, is the issue of whether the dispute over the Euclid employees is subject to the alternative dispute resolution mechanism of article 45. If the court answers that question in the affirmative, Bulkmatic has no basis for the declaratory relief it seeks (and such a ruling would in fact mean Bulkmatic committed a colossal blunder by refusing to participate in the grievance process). Moreover, should the court hold the dispute was properly submitted to alternative dispute resolution, the court would enforce the October 2, 2001 decision of the Ohio Joint State Committee. On the other hand, if the court concludes the dispute was wrongfully submitted to the Ohio Joint State Committee, the October 2, 2001 decision of the Ohio Joint State Committee would be unenforceable.

■ The court is mindful of the rule that "in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying case." *AT & T Tech., Inc. v. Comm'n. Workers,* 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986); *accord Independent Lift Truck Builders Union v. Hyster Co.,* 2 F.3d 233, 236 (7th Cir.1993). To do so would invade the province of the arbitration process. Occasionally, the issue of arbitrability and the underlying dispute overlap, rendering impossible fidelity to this rule of mutual exclusivity. This is one such situation. The matter to be interpreted has direct effects both on the overarching question of which adjudicative body (the district court or the Ohio Joint State Committee) should decide the underlying dispute, and the underlying dispute itself. This court has the power to make this former determination notwithstanding any ruling on the underlying merits by the Ohio Joint State Committee. Circuit Judge Diane P. Wood recently expressed similar sentiments on a court's paramount obligation to address arbitrability.

> Before turning to the details of this case, it is important to clarify what is and what is not before us. Our focus is on whether this dispute is arbitrable, and to a certain degree it is about who should decide certain issues. Normally, the question of the arbitrability of a labor-management dispute is a matter to be resolved by the courts. *Chicago Dist. Council of Carpenters Pension Fund v. K & I Construction, Inc.,* 270 F.3d 1060, 1066 (7th Cir.2001).

*Int'l. B'hood of Elect. Workers, Local 176 v. Balmoral Racing Club, Inc.,* 293 F.3d 402, 404 (7th Cir.2002). This court must decide the arbitrability issue, even if to do

so requires adjudication of issues intertwined with the underlying merits. With the contours of the task adequately sketched, the court will proceed to interpretation of the contract, with federal law supplying the rule of decision, *see Chicago Painters and Decorators Pension, Health and Welfare and Deferred Sav. Plan Trust Funds v. Karr Bros., Inc.*, 755 F.2d 1285, 1290 (7th Cir.1985) ("[F]ederal law governs the interpretation of collective bargaining agreements in section 301 suits.").

### A.

In its October 2, 2001 decision, the Ohio Joint State Committee explicitly referenced article 45 of the Supplement as the basis for its ruling by default in favor of Local 407, and provides a good place to begin the court's analysis. Article 45, entitled "Grievance Machinery and Union Liability" contains this preamble: "[t]he following language shall take precedence over any articles to the contrary in the National Master Freight Agreement and shall prevail for employees covered by this Supplement." The "following language" referred to in the preamble is a litany of principles guiding alternative dispute resolution, including resort to a Joint State Committee if the union and the employer fail to reach an amicable solution. (*See* Supplement at art. 45, § 1(a).) "Where a Joint State Committee by a majority vote settles a dispute, ... [s]uch decision will be final and binding on both parties." (*Id.*) The Ohio Joint State Committee decision was unanimous and according to article 45, section 1(a) is binding upon Bulkmatic, and according to the preamble to article 45 "shall prevail for employees covered by this Supplement." The Ohio Joint State Committee's ruling "shall prevail" for the Cleveland workers because it is undisputed they are "covered by this Supplement." The Cleveland collective bargaining unit, however, had no interest in reaping the benefits of the Committee's

decision because on the date of the ruling (October 2, 2001), they were already covered by the collective bargaining agreement. The eligible Euclid employees were the only ones with a *bona fide* interest in the Committee's decision. It is still not established, however, whether the Committee's decision "shall prevail" upon the eligible Euclid workers. That question turns on whether they are "covered by this Supplement," which brings us to the intersection of the issues of arbitrability and the underlying merits, with the answer to one necessarily leading to the resolution of the other. The next interpretive task, therefore, is to address whether the eligible Euclid workers are "employees covered by this Supplement," as that phrase appears in article 45 of the Supplement.

■ This question requires a review of the Rider. The Rider was duly executed on August 10, 1998 by both Bulkmatic and Local 407, and made effective back to April 1, 1998. (*See* Rider at 6.) The last sentence of Article X provides language of crucial import to the court's interpretive task. It states (as pertinent here) that "[a]ny references to ... employees other than those employed at the Company's terminal located at 1635 Merwin Avenue, Cleveland, Ohio contained anywhere in the Area Agreement are superceded by this Rider." (Rider at art. X.) This language is susceptible to only one meaning. It is an unambiguous and unequivocal directive to eliminate any reference or mention or hint of any employees other than workers at the Cleveland depot. In effect, the parties agreed to change (or perhaps confirm) the definition of "employee" throughout the Master Agreement, Supplement, and Rider as meaning a natural person covered by the collective bargaining agreement and working at the Cleveland depot. Article X of the Rider means the decision of the Committee does *not* "prevail" for employees working at the Euclid facility.

Because the court arrives at this conclusion without confronting any ambiguous contractual language, reference to extrinsic evidence is unnecessary.

### B.

Even assuming contractual language germane to this dispute is ambiguous, thereby requiring consideration of extrinsic evidence, the court would similarly conclude the Cleveland collective bargaining agreement does not cover the eligible Euclid employees.

In his affidavit, Michael Brown, a Bulkmatic Regional Manager, and the person responsible for labor relations and collective bargaining, (*see* Brown Decl. at ¶ 2) indicates that on January 19, 2001, his team began negotiating for a contract to cover Euclid employees (*see id.* at ¶ 6). Bulkmatic's delegation again met with Local 407 on February 14, February 15, and March 5, 2001 to discuss a collective bargaining agreement for Euclid employees. (*See id.* at ¶ 7.) According to Brown, "[d]uring these negotiations, Local 407 never once asserted that an agreement already existed setting forth the terms and conditions of employment for employees at Bulkmatic's Euclid facility." (*Id.* at ¶ 8.) The first mention of the potential application of the automatic inclusion language of article 2, section 3(a) was made in Michael Murphy's letter dated April 2, 2001, in which he "request[ed] that [Bulkmatic] immediately extend coverage" to the eligible Euclid employees. (Murphy Ltr. at 1; *see also* Local 407 Brief in Supp. of Summ. J. at 2 (citing Murphy Ltr.).) This invitation was declined. A subsequent letter urging Bulkmatic to revisit its decision, was similarly cast aside. (*See* Compl. at Exs. 5 & 7; Sizemore Aff. at ¶ 4 ("Each request to extend coverage of the Area Agreement was denied by Bulkmatic.").)

After certification at the Euclid depot, the parties negotiated on four occasions, spread over the course of approximately eight weeks. The parties had ample time to invoke the automatic inclusion clause of article 2, section 3(a); neither party did so, even though the exact same entities (Bulkmatic and Local 407) that hammered out the contract governing Cleveland employees were now negotiating a pact for Euclid. A reasonable view of these events leads to the conclusion that the parties did not mention the automatic inclusion clause at any time during these face-to-face negotiations because the parties had no mutual understanding of a binding automatic inclusion provision. The presumed purpose of language such as the automatic inclusion clause is to reduce transaction costs. If another segment of the same employer's workforce agrees to delegate bargaining power to Local 407, the terms, conditions, and fruits of employment are automatically governed by an existing contract. This obviates the need to allocate substantial resources to lengthy (and typically contentious) bargaining and drafting sessions. This cost saving benefits both sides, leading one to conclude that if it were the intent of Bulkmatic and Local 407 to have an automatic inclusion trigger, *at least one side* would have invoked automatic inclusion *at the outset*. The timing is crucial. As the parties begin to negotiate, they expend resources, and the mutually beneficial character of an automatic inclusion clause disappears. In this case, the parties negotiated on four occasions with intervals between the sessions, which would allow the parties to review the Cleveland agreement and refresh their recollection that they agreed therein to eschew this process if, like here, another discrete employee group decided to have Local 407 bargain on their behalf. At the end of the fourth session, any possible cost saving would have evaporated. Thus, the parties' behavior is entirely inconsistent with the existence of a valid and enforceable automatic inclusion provision.

■ Even if the court assumes, as Local 407 maintains, that the automatic inclusion provision was part of the Cleveland collective bargaining agreement, Local 407 had an added and unique incentive (separate and apart from the mutually beneficial saving of transaction costs) to immediately exercise rights under the Clause. Its failure to do so casts additional doubt on Local 407's position that this provision was the product of the parties' mutual assent. Cleveland is a major city, substantially larger than Euclid; these are facts the existence of which the court takes judicial notice, see Fed.R.Evid. 201. One would therefore expect Cleveland to have a higher cost-of-living than Euclid, meaning Cleveland workers would require more compensation to enjoy the same standard of living as Euclid residents. If a person is paid a level of compensation commensurate with Cleveland rates, but actually works in Euclid, the Euclid worker would reap an economic windfall.[4] If the collective bargaining agreement in this case were automatically applicable to Euclid employees, they would receive the terms and conditions at Cleveland levels, resulting in a windfall.

■ First, as a business matter, it is unlikely Bulkmatic would have assented to such an arrangement, allowing Euclid employees (or workers at any other Bulkmatic facility anywhere else in the seventeen states where it maintains a commercial presence) to reap a windfall at the company's expense. The language of the Rider, with repeated references to the Cleveland depot (see, e.g., Rider at preamble & art. X) strongly suggests Bulkmatic was cognizant of this risk and was attempting to guard against it. Contract law does not proscribe foolhardy bargaining (which, as this discussion illustrates, would result if the court ignored the language in the Rider that limits the scope of the agreement to Cleveland employees). The parties' actions, however, cast doubt upon the reasonableness of the course Local 407 urges the court to adopt.

Second, if the parties did agree to the automatic inclusion (or thought of in the inverse, did not agree to limit the agreement to Cleveland employees), the prospect of a windfall for Local 407's members acts as strong motivation to invoke that provision at the outset. Local 407 failed to do so, leading the court to hold the parties had no agreement whereby eligible Euclid employees would immediately become covered by the collective bargaining agreement applicable to Cleveland workers.[5]

4. When a discrete employee group chooses to unionize, they receive a wage premium (often 20% to 30% depending on the industry) above market rates. See Debbie Mullin, A New Look at the Union Wage Premium during the Early Years of the AFL, 51 INDUS. & LAB. REL. REV. 253, 253 (1993) (describing "[w]age increases, among the most obvious effects of union organization"); see also Rosemary Batt, Explaining Wage Inequality in Telecommunications Services: Customer Segmentation, Human Resource Practices, and Union Decline, 54 INDUS. & LAB. REL. REV. 425, 427 (2001) (noting a 22% wage premium). But see Dale L. Belman & Kristen A. Monaco, The Effects of Deregulation, De–Unionization, Technology, and Human Capital on the Work and Work Lives of Truck Drivers, 54 INDUS. & LAB. REL

REV. 502, 509 (2001) (observing "declining union wage premiums"). Thus, in a certain sense, all union employees enjoy a "windfall." When used in this text, however, "windfall" is meant to represent an economic benefit beyond the usual wage premium prevalent in that industry.

5. In addition, the court is skeptical of the enforceability of an automatic inclusion clause under federal common law. The statutory roots of American labor law took hold in the New Deal, particularly the Wagner Act of 1935, Pub.L. No. 74–198, 49 Stat. 449 (1935) (codified as amended at 29 U.S.C. §§ 151–169). See generally Richard A. Posner, Some Economics of Labor Law, 51 U. CHI. L. REV.

## C.

The cross-motions between IBT and Bulkmatic are the only matters remaining. According to its motion, IBT offers three bases for summary judgment. IBT contends Bulkmatic "has failed to present any evidence to warrant holding that the grievance procedure contained in the collective bargaining agreement is not the proper forum for resolving the grievance in dispute." (IBT Mot. at ¶ 3.) The court's ruling on the interpretive issues raised in these motions, *see supra* Part IV.A–B, forecloses this ground. IBT also pursues two other theories, namely that Bulkmatic "has failed to show that the [IBT] is a proper party to this proceeding," (*id.* at ¶ 1) and that Bulkmatic "has failed to state a claim against [IBT] under [LMRA section 301]" (*id.* at ¶ 2). These arguments overlap. If IBT is correct in maintaining it is not a proper party (because it is not a signatory or otherwise bound to the Cleveland collective bargaining agreement), Bulkmatic is unable to sustain a claim for "violation of contracts" against IBT as a matter of law. *See Loss v. Blankenship,* 673 F.2d 942, 946 (7th Cir.1982) ("It is our opinion that this section 301 suit failed to state a claim against Sears for the reason that it undisputably appears from the pleadings, affidavits, and the contract in issue that Sears was not a party to the collective bargaining agreement which was the basis of the plaintiffs' claim."). Thus, the court will consolidate the two grounds.

IBT points to the Master Freight Agreement's definition of the term "Unions Covered." (*See* IBT Mem. in Supp. of Mot. at 8.) It provides

The Union consists of any Local Union which may become a party to this Agreement and any Supplemental Agreement as hereinafter set forth. Such Local Unions are hereinafter designated as "Local Union." In addition to such Local Unions, the Teamsters National Freight Industry Negotiating Committee representing Local Unions affiliated with the International Brotherhood of Teamsters, hereinafter referred to as the "National Union Committee," is also a party to this Agreement and the agreements supplemental hereto.

(Master Freight Agreement at art. 1, § 2.) It is undisputed that IBT is not a "Local Union" as that term appears in article 1, section 2. Language in the IBT's Constitution confirms this view. (*See* IBT Mem. in Supp. of Mot. at Ex. 3A, p. 1 ("[T]he local unions preserved their autonomy and identity.").) The only remaining possibility upon which to include IBT as part of the "Unions Covered" is to somehow impute the inclusion of the "National Union Committee" ("NUC") in article 1, section 2, to IBT. Bulkmatic posits exactly such a scenario. (*See* Pl. Resp. at 4–6.) In particular, it contends NUC "negotiated and signed the [Master Agreement] on behalf of covered employees." (*Id.* at 5.) Bulk-

---

988, 991 (1984) (noting "the revolution in labor law brought about by the Wagner Act of 1935"). Section 7 of the Wagner Act provides workers with valuable rights, including the right to collectively bargain. *See* 49 Stat. at 452 (codifying "the right to ... bargain collectively"). *See generally* Richard A. Epstein, *A Common Law for Labor Relations: A Critique of the New Deal Labor Legislation,* 92 YALE L.J. 1357, 1386–87 (1983).

Enforcing the automatic inclusion clause with respect to Euclid employees in this case would work to undermine section 7 of the

Wagner Act. The collective bargaining agreement at issue in this case was negotiated between Bulkmatic and its Cleveland employees (with Local 407 acting on its behalf) at a time when Euclid workers had not yet decided to surrender the individual liberty necessary for a collective bargaining unit to cohere, *see* Epstein, *supra* at 1364–65. Thus, to hold that the Cleveland agreement automatically extends to the Euclid depot would strip these workers of the benefit of a collective bargaining effort undertaken on *their behalf.*

matic seeks to use agency principles to bind a non-signatory to the contract, a legal theory with adequate support in federal case law. *See Fyrnetics v. Quantum Group, Inc.*, 293 F.3d 1023, 1028–29 (7th Cir.2002) ("[T]he district court correctly explained that there are several ways that a non-signatory can be bound by a contract, such as through the doctrine[ ] of ... agency."); *see also Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 352 (2d Cir.1999).

For factual support, Bulkmatic looks to Brown's affidavit. (*See* Pl. Resp. at 5.) This proposition poses two problems which prove insurmountable to Bulkmatic. First, Brown's affidavit makes no mention whatsoever of the negotiations that preceded the execution of the Cleveland collective bargaining agreement, let alone indicate NUC's role in those talks. Second, from the copy of the Master Agreement annexed to Brown's affidavit, it is impossible to confirm Bulkmatic's contention that NUC "signed the [Master Agreement]" because Bulkmatic attached an *un*executed copy. (*See* Brown Decl. at Ex. A, p. 200.) Notwithstanding this snafu, Bulkmatic's argument crumbles. In the executed copy of the Master Agreement attached to IBT's filing, the only two signatures appearing on the document are a person identifying him/her self as President of Local 407 and Brown, Bulkmatic's Regional Manager. (IBT Mem. in Supp. of Mot. at Ex. 1, p. 200.) Bulkmatic has offered nothing, based on precepts of agency law or otherwise, to link the signature of the President of Local 407 to IBT. What is more, the record strongly suggests IBT and Local 407 are distinct entities (meaning execution of a contract by one does not *ipso facto* bind the other).

For example, Bulkmatic tendered a Form LM–2, entitled "Labor Organization Annual Report." (Pl. Resp. at Ex. 1.) This document was filed with the Department of Labor and reflects IBT's operations for the 1998 calendar year. Item number 16 asks for a list of "[o]fficers receiving compensation as an officer or employee of *another labor organization*." (*Id.* at p. 5 (emphasis added).) IBT reported sixteen persons meeting this criteria. When asked to disclose to what "Other Labor Organization" these person belonged, IBT revealed all sixteen were affiliated with at least one union local. Since these various locals are referred to as "Other Labor Organization[s]," IBT's answer to item number 16 supports the suggestion that execution of a collective bargaining agreement by Local 407's President does not simultaneously bind IBT to the contract.

Bulkmatic also included a "Statement of Genuine Issues" ("SGI") as part of its response. (*Id.* at Ex. 3.) In it, Bulkmatic attempts to draw an agency relationship from the nature of the defendants' actions. These statements are not only cast with the wrong inflection (a SGI is not the place for argument), but also unavailing. Bulkmatic indicates IBT "controlled the actions of Local 407 ... in the negotiations with Bulkmatic over a collective bargaining agreement pertaining to employees at the Euclid facility." (SGI at ¶ 1.) This is patently immaterial to the question of whether IBT is contractually *bound to the Cleveland collective bargaining agreement*. At the time the talks regarding the Euclid depot commenced (January 2001), the Cleveland agreement was already in effect, meaning the negotiations leading up to the Cleveland pact were already complete. Thus, whatever role IBT may have played in the negotiations with Bulkmatic from January 2001 forward has no bearing on IBT's conduct relative to the Cleveland collective bargaining agreement.

Similarly, Bulkmatic asserts IBT "participated in ... and pursued the entry of the disputed grievance award." (*Id.* at ¶ 2.) It is difficult for the court to appreci-

ate its relevance. IBT may have been a large cog in the grievance machinery (although the fact Sizemore, Local 407's Business Representative, signed the grievance form casts doubt on this). Nevertheless, aiding and assisting another person or entity in pursuit of perceived contractual rights does not bind the aider to the contract, else the law firm Bulkmatic retained to commence this action would have become a party to the Cleveland collective bargaining agreement upon filing the Complaint.

It is therefore abundantly clear to the court that Local 407's signature does not make IBT a party to the Cleveland collective bargaining agreement. The undisputed facts in the record necessitate a ruling in favor of IBT. It is not a party to the Cleveland collective bargaining agreement; Bulkmatic is thus unable to state its claims against IBT as a matter of law.

## V. CONCLUSION

Bulkmatic's motion for summary judgment (Dkt. Entry # 33) is **GRANTED IN PART** and **DENIED IN PART**. Local 407's motion (Dkt. Entry # 31) is **DENIED**. IBT's motion (Dkt. Entry # 29) is **GRANTED**.

**IT IS HEREBY ORDERED, DECREED, AND ADJUDGED THAT** the contract attached to the Complaint does not automatically cover eligible Euclid employees.

The Clerk is directed to enter judgment in favor of Bulkmatic and against Local 407 on Counts One and Two of the Complaint and upon Local 407's counterclaim; and a separate judgment in favor of IBT and against Bulkmatic on Counts One and Two of the Complaint.

**SO ORDERED.**