In the

# United States Court of Appeals
## For the Seventh Circuit

No. 03-1011

WILLIAM E. DUGAN, *et al.*,

*Plaintiffs-Appellants,*

*v.*

R.J. CORMAN RAILROAD COMPANY, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 C 4114—**Charles P. Kocoras**, *Chief Judge.*

ARGUED JUNE 2, 2003—SEPTEMBER 22, 2003

Before POSNER, EASTERBROOK, and WILLIAMS, *Circuit Judges.*

POSNER, *Circuit Judge.* The trustees of multiemployer welfare and pension funds have sued Corman under ERISA for failing to make contributions that the trustees claim Corman was required to make by collective bargaining agreements that it had made with the union effective in 1992, 1993, and 1996, respectively. The district judge ruled for Corman after a trial based on a stipulated record, and the trustees appeal.

Corman provides emergency services when a railroad (or an industrial facility that has its own rail facilities) suffers

a derailment. The services include righting or disposing of derailed cars by means of heavy equipment owned by Corman, repairing damaged sections of track, and cleaning up hazardous spills from derailed cars. Between derailments there is work "in the shop," that is, work at the facilities in which Corman stores and maintains the equipment that it uses to clean up derailments and from which its employees sally forth when a derailment occurs in the vicinity of the facility to which they are assigned. One of these facilities is in Gary, Indiana—or rather was. The last collective bargaining agreement between Corman and the union concerning workers at the Gary facility, the 1996 agreement, expired at the end of 1999. Negotiations for a new agreement collapsed the following May, when Corman withdrew recognition from the union. The union struck in June and Corman closed the facility at the end of that month.

The dispute giving rise to this suit concerns 25 workers employed at various times between 1992 and 2000 at the Gary facility who Corman contends were "casual employees" not entitled by the collective bargaining agreements to pension and welfare benefits but who the trustees contend were regular employees and thus entitled to the benefits. (It appears that on average the Gary facility was staffed by between four and eight employees conceded to be regular employees plus one or two of the so-called casual employees.) Two of the 25 worked after the last agreement expired; the contributions due on behalf of these workers present a distinct issue discussed later in this opinion.

The 1996 collective bargaining agreement defined "casual employees" as "employees hired for a specific customer project. Nothing in this section is to prevent casual employees from future employment on customer projects. Furthermore, no casual employee will be employed if such

employment causes a reduction or prevents an increase in hours of any present full-time and/or regular part-time employee. Also, no casual employees shall be employed as a means of preventing an increase in the number of full-time and/or regular part-time employees." The 1992 agreement had contained a similar definition but with the addition that "casual employees' hours of employment shall not exceed 60 hours in a calendar month and/or a customer project, whichever is greater." Because Corman had difficulty finding workers willing to accept emergency calls for temporary work cleaning up derailments when the income from that work was so limited, the hour restriction was omitted from the subsequent agreements.

So far as the scope of our appellate review is concerned, we note that a trial on a stipulated paper record is equivalent to a conventional trial on (largely) oral evidence. *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001). Since the district judge based his interpretation of the 1996 agreement not just on its language but also on the language that we just quoted from the 1992 agreement and on the evidence we mentioned that was offered to explain why that language was changed, the standard of appellate review applicable to the interpretation might seem to be that of clear error, rather than the de novo (plenary) standard. *Cook Inc. v. Boston Scientific Corp.*, 333 F.3d 737, 742 (7th Cir. 2003). But that is on the assumption that the judge was right to consider evidence "extrinsic" to the 1996 agreement. He was not if that agreement was clear as written, e.g., *Geier v. Medtronic, Inc.*, 99 F.3d 238, 244 (7th Cir. 1996); *RJE Corp. v. Northville Industries Corp.*, 329 F.3d 310, 314 (2d Cir. 2003) (per curiam)—a principle fully applicable to collective bargaining agreements. *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 608 (7th Cir. 1993) (en banc); *Mazzei v. Rock-N-Around Trucking, Inc.*, 246 F.3d 956, 960 (7th Cir. 2001); *Pierce County Hotel Employees & Restaurant Employees Health Trust*

*v. Elks Lodge, B.P.O.E. No. 1450,* 827 F.2d 1324, 1327 (9th Cir. 1987). We think that the agreement was clear as written and that therefore the judge should not have looked outside it, and thus that our review should be plenary because the interpretation of a contract is treated as an issue of law when extrinsic evidence is not used in the interpretation. E.g., *Alexander v. City of Evansville,* 120 F.3d 723, 727 (7th Cir. 1997); *Ryan v. Chromalloy American Corp.,* 877 F.2d 598, 602 (7th Cir. 1989); *RJE Corp. v. Northville Industries Corp., supra,* 329 F.3d at 314.

A further wrinkle is that the judge thought that only the 1996 agreement was at issue, but this is incorrect because some of the employees in question worked under the earlier agreements. That makes no difference to the appeal; the only difference among the agreements, so far as the definition of "casual employees" is concerned—the 60-hour restriction found in the first and dropped in the second and third agreements—is, as we'll see, immaterial.

Corman argues that as long as a worker was initially hired to work on a specific project, he could be retained to work between projects (and thus in the shop) without losing the status of a casual employee. We disagree. A "casual employee," in normal parlance as in the language of the agreements, is one hired for a specific project or other limited purpose, so that his employment ceases when he finishes his work on the task that he was hired to do. See *Central States, Southeast & Southwest Areas Pension Fund v. Kroger Co.,* 226 F.3d 903, 912 n. 2 (7th Cir. 2000); *Central States, Southeast & Southwest Areas Pension Fund v. Independent Fruit & Produce Co.,* 919 F.2d 1343, 1350 (8th Cir. 1990). Employers faced with unpredictable surges in demand—which is a good description of a company whose business is cleaning up derailments—need a flexible workforce, and one way of imparting flexibility is to have

a reserve pool of workers who go off the payroll when the surge recedes. Such workers are "casual employees." Their leaving the payroll when the specific job for which they've been hired ends is implicit in the definition of them in the collective bargaining agreements as employees "hired for a specific customer project." Corman acknowledges that "specific customer project" means a specific derailment. The sentence that follows the definition of casual employees states that they are not barred "from future employment *on customer projects*" (emphasis added), implying that they can't be rehired to do storage and maintenance or the other tasks that are performed between derailments and that correspond to what firemen do between fires; no more can they be hired for such work initially.

The deletion of the 60-hour limit found in the 1992 collective bargaining agreement has no bearing on "casual employees" who did not bump up against the limit or did not work under that agreement and so were not bound by the limit. Under the subsequent agreements a casual employee who worked 80 hours in a two-week period was still a casual employee—provided he spent those 80 hours working only on derailments rather than performing maintenance or other chores in the Gary shop. At argument Corman's lawyer contended that the only limitation on casual employees in the later agreements is that they may not take work away from regular employees. That is not the only limitation. A casual employee loses his status if he takes work away from the regular employees, yes—but he is not entitled to that status in the first place unless hired to work on a specific customer project, that is, a derailment, and he loses that status if, though initially hired to work on a derailment, he is retained to work in the shop after his work on the derailment is finished.

The question then is whether the 25 employees ever worked in the shop. Information culled from payroll records indicates the number of hours that employees, whether regular or casual, who were assigned to the Gary facility worked every week. The hours are classified as "Regular," "Wreck," or "OT-Wreck" ("OT" standing for overtime). "Regular" suggests work not tied to a specific derailment (and thus not tied to a specific customer project, and thus continuing in the shop between derailments), while "Wreck" and "OT-Wreck" suggest work on a specific derailment. An appendix to the collective bargaining agreements states that the "Regular Shop rate shall be [for] all hours worked in the shop." This is further evidence that "Regular" work is work done by regular employees; in contrast, "Wreck" rates are for "customer service work." And the 25 employees whose status is in issue worked approximately the same total hours, and with approximately the same proportion of regular to wreck hours, as the regular staff of the Gary facility.

It is, we acknowledge, conceivable that much or for that matter all work described as "Regular" was actually tied to a specific derailment or a succession of derailments. There is no evidence of the frequency of derailments or the average length of time it takes to clean one up, and so we don't know whether derailments follow so hard upon each another that a casual employee might be employed for months on end on specific customer projects with only nominal breaks in service (not showing up in the company's records) between projects and thus without doing any "regular" work. That seems unlikely, however, and at argument Corman's lawyer conceded that the "regular" work shown on the employee records was indeed work not tied to a specific customer project. We hesitate to hold parties to concessions that their lawyers make in the heat of argument. But Corman's trial brief

had said in like vein that "most of the casuals *who did work regularly and stayed with the company over an extended period of time* eventually were promoted to 'regular' positions with full CBA [collective bargaining agreement] coverage" (emphasis added), which implies that the so-called casual employees did regular work before they were reclassified as regular employees; and employees who do regular work are regular employees.

Given that the 25 so-called casual employees were in fact regulars, it is difficult to understand why their casual status wasn't forfeited by virtue of the limitation that Corman itself emphasizes—that casual employees may not substitute for regular ones. Maybe Corman couldn't afford to pay regular wages and fringes to additional workers, but if so it should have renegotiated the collective bargaining agreement to permit it to hire additional regular workers on terms different from those of its core staff. Such two-tier hiring is unexceptionable.

We have next to consider the trustees' quest for contributions on behalf of the two of the 25 employees who worked after the last collective bargaining agreement expired in December 1999. The trustees argue that Corman extended the collective bargaining agreement both by continuing to make the contributions (on behalf of those employees whom Corman recognized as regulars) that were required by the agreement for seven months after it expired and by signing reports of contributions to the funds that stated that "the undersigned employer, if not already a signatory hereby becomes a signatory party to the current applicable Collective Bargaining Agreement."

In a related case, *R.J. Corman Derailment Services v. International Union of Operating Engineers, Local Union 150, AFL-CIO*, 335 F.3d 643 (7th Cir. 2003), the district court held that

a dispute between Corman and the union over wages was subject to an arbitration provision in the expired agreement. We reversed on procedural grounds without deciding whether "Corman was continuing to abide by at least the wage terms of the expired CBA because (a) it believed that there was a new agreement between the parties, (b) it believed that the old agreement had been extended, or (c) because as a unilateral matter it was simply abiding by the old terms in good faith while attempting to negotiate a new agreement." *Id.* at 648.

We reject both of the trustees' arguments. But we do not reject the second (the one based on the language that we quoted from the contributions report) for the reason given by Corman—that the language is "boilerplate." In the absence of fraud, mistake, unconscionability, or like defenses, a person is bound by all provisions in a contract, including standard provisions colloquially described as "boilerplate." (We have no doubt that Corman enforces boilerplate provisions in the contracts that it drafts.) There is no "mere boilerplate" defense to a suit for breach of contract (or a defense to a defense to such a suit), *Operating Engineers Local 139 Health Benefit Fund v. Gustafson Construction Corp.*, 258 F.3d 645, 650 (7th Cir. 2001); *Adams v. Merrill Lynch Pierce Fenner & Smith*, 888 F.2d 696, 700-01 (10th Cir. 1989), any more than there is a "fine print" or "I didn't read it" defense. *Paper Express, Ltd. v. Pfankuch Maschinen*, 972 F.2d 753, 757 (7th Cir. 1992); *Northwestern National Ins. Co. v. Donovan*, 916 F.2d 372, 377-78 (7th Cir. 1990); *Heller Financial, Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1292 (7th Cir. 1989); *Schell v. Ford Motor Co.*, 270 F.2d 384, 386 (1st Cir. 1959). Allowing such defenses would be a throwback to the era of exaggerated concern with the supposed one-sidedness of form or standard contracts denigrated as "contracts of adhesion." As we explained in *Northwestern National Ins. Co. v. Donovan, supra*, 916 F.2d

at 377, "widespread judicial suspicion of the form contract—the dreaded 'contract of adhesion,' the contract that is offered by the authoring party on a take it or leave it basis rather than being negotiated between the parties . . . [—]has never crystallized . . . in a rule making such contracts unenforceable, on grounds of fraud or duress or unconscionability or mistake or what have you, or even presumptively unenforceable . . . . Although the vagueness of the concept of unconscionability may seem to place contracts of adhesion under a cloud, they are generally upheld against attacks from that direction." See also *DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 332-34 (7th Cir. 1987); *Adams v. Merrill Lynch Pierce Fenner & Smith, supra*, 888 F.2d at 700-01.

What is true is that boilerplate will sometimes be irrelevant to the document in which it has been unthinkingly inserted, e.g., *Hamdan v. INS*, 98 F.3d 183, 189 (5th Cir. 1996); *United States v. Lombardi*, 5 F.3d 568, 572 n. 4 (1st Cir. 1993)—as in this case. The boilerplate that we quoted from the report of contributions is meant for the situation in which an employer who has not yet signed a collective bargaining agreement nevertheless acts in conformity with it, indicating an intention to be bound. If no agreement is in force, there is nothing for him to adhere to. Granted, Corman continued after the collective bargaining agreement expired to make contributions for those employees (not the two in question, who are among the 25 whom Corman improperly classified as casual employees) whom it acknowledged to be regular employees. This is evidence, as the trustees argue (it is their first argument for why Corman owes contributions for the two "casual" workers who worked after the agreement expired), that Corman considered the agreement to be still in effect despite its formal expiration. *Firesheets v. A.G. Building Specialists, Inc.*, 134 F.3d 729, 731 (5th Cir. 1998) (per curiam). It is weak evi-

dence, however—evidence the district judge was not required to credit—because Corman had made clear its unwillingness to continue its relationship with the union, and the funds were the offspring of that relationship.

But before dismissing the evidence, we must consider the bearing of the fact that ERISA does not authorize contributions to a union welfare benefits plan other than in accordance with a written agreement, 29 U.S.C. § 1145, and that the Landrum-Griffin Act positively forbids payments to a union or union-related entity other than in accordance with a written agreement. 29 U.S.C. § 186(c)(5)(B). These provisions might seem to compel an inference that Corman's contributions were made pursuant to a subsisting, effective agreement, which could only have been the collective bargaining agreement, tacitly extended. But the cases hold that an expired agreement—one that has no *contractual* force—nevertheless can satisfy the statutory requirements, "in part because even after expiration of such an agreement, an employer has a duty to bargain in good faith and maintain the status quo as to wages and working conditions until a new agreement or an impasse is reached." *Alaska Trowel Trades Pension Fund v. Lopshire*, 103 F.3d 881, 883 (9th Cir. 1996); see also *Gariup v. Birchler Ceiling & Interior Co.*, 777 F.2d 370, 375 (7th Cir. 1985); *Denver Metropolitan Ass'n of Plumbing, Heating, Cooling Contractors v. Journeyman Plumbers & Gas Fitters Local No. 3*, 586 F.2d 1367, 1373 (10th Cir. 1978).

It follows that the continued contributions may not even have been voluntary on Corman's part, and if they were involuntary they certainly were not an acknowledgment of a contractual obligation. After the expiration of the 1996 collective bargaining agreement and while the parties were attempting to negotiate a new one, Corman was obligated by the National Labor Relations Act to maintain the status

quo, *NLRB v. Katz*, 369 U.S. 736, 737-39, 743 (1962); *NLRB v. Emsing's Supermarket, Inc.*, 872 F.2d 1279, 1284-85 (7th Cir. 1989), and the status quo included making contributions required by the expired collective bargaining agreement. *American Distributing Co. v. NLRB*, 715 F.2d 446, 449, 451-52 (9th Cir. 1983); *NLRB v. Cauthorne*, 691 F.2d 1023 (D.C. Cir. 1982); *Producers Dairy Delivery Co. v. Western Conference of Teamsters Pension Trust Fund*, 654 F.2d 625, 627 (9th Cir. 1981); *Peerless Roofing Co. v. NLRB*, 641 F.2d 734, 736 (9th Cir. 1981). It is true that although the negotiations terminated in May of 2000, five months after the collective bargaining agreement expired, Corman continued for two more months making contributions on behalf of those employees whom it had classified as regular employees. But Corman could not be certain that the Labor Board would agree that a bargaining impasse had been reached in May, compare *Beverly Farm Foundation, Inc. v. NLRB*, 144 F.3d 1048, 1055 (7th Cir. 1998), and so it may have decided to continue contributing for a time merely out of an abundance of caution.

The last issue, a footnote to the one just discussed, is whether the district judge was right to strike an affidavit presented by the trustees that quoted from a "Trust Agreement" that they argue constituted an agreement by Corman to make contributions even after the expiration of the collective bargaining agreement. Ordinarily an affidavit would not be evidence at a trial, but remember that the trial in this case was, by agreement of the parties, conducted on a purely paper record.

The judge struck the affidavit on the ground that it was unreliable because the Trust Agreement itself was not attached; indeed, the agreement never was made a part of the record. He was entitled to do this. The meaning of quoted phrases often depends critically on the unquoted

context, and it is therefore a bad practice (and will often and here violate both the "best evidence" rule of Fed. R. Evid. 1002 and the "completeness" rule of Fed. R. Evid. 106) to present trial excerpts from a key document without introducing the document itself. *Frymire-Brinati v. KPMG Peat Marwick*, 2 F.3d 183, 187 (7th Cir. 1993); *American Bald Eagle v. Bhatti*, 9 F.3d 163, 167-68 (1st Cir. 1993); *United States v. Marin*, 669 F.2d 73, 84-85 (2d Cir. 1982); 2 *McCormick on Evidence* § 231 (John W. Strong ed., 5th ed. 1999). Imagine the trial of a breach of contract case in which the contract is not placed in evidence, but only a few snippets; that was what the trustees were trying to do.

They argue Corman did not make its objection to the affidavit clear enough. But Corman said that the affidavit was not the best evidence of what the Trust Agreement provided, and that was good enough. Anyway a judge is entitled to exclude unreliable evidence even if no party objects. E.g., 1 *id.*, § 55; *HDM Flugservice GMBH v. Parker Hannifin Corp.*, 332 F.3d 1025, 1034 (6th Cir. 2003); *Maddox v. Patterson*, 905 F.2d 1178, 1180 (8th Cir. 1990); *Sterling Drug, Inc. v. Cornish*, 370 F.2d 82, 85-86 (8th Cir. 1966). For even in our adversarial system the judge is not merely an umpire. Implicit in the broad discretion that trial judges enjoy in the management of trials is the judge's responsibility both to conserve judicial resources and to secure the basic accuracy of the litigation process. Had the trustees presented an affidavit from an astrologer or a psychic concerning the meaning of "casual employees," the judge would have been entitled, indeed required, to exclude it even if Corman had not objected. The principle is similar to that which would, as we pointed out in *Lloyd v. Loeffler*, 694 F.2d 489, 495 (7th Cir. 1982), divert a judge from deciding a contract case by reference to the Code of Hammurabi even if the contract contained a choice of law clause that selected the Code

to be the law applicable to disputes arising out of the contract.

With the affidavit properly excluded, there is no basis for our disturbing the district judge's ruling that Corman had no contractual obligation to the funds on behalf of the two "casual" employees who worked after the last collective bargaining agreement expired. The judgment of the district court is therefore affirmed with respect to the post-expiration contributions, but reversed with respect to the pre-expiration contributions, and the case is remanded for a determination of the amount of money to which the funds are entitled.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*