RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0301p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

BOARD OF TRUSTEES OF THE PLUMBERS, PIPE
FITTERS & MECHANICAL EQUIPMENT SERVICE,
LOCAL UNION NO. 392 PENSION FUND, et al.,
            *Plaintiffs-Appellants,*

            *v.*

B&B MECHANICAL SERVICES, INC.,
            *Defendant-Appellee.*

No. 14-4017

_____

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:12-cv-00195—Michael R. Barrett, District Judge.

Argued: July 30, 2015

Decided and Filed: December 29, 2015

Before: COLE, Chief Judge; GIBBONS and STRANCH, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Joseph E. Mallon, JOHNSON & KROL LLC, Chicago, Illinois, for Appellants. Curtis L. Cornett, CORS & BASSETT, LLC, Cincinnati, Ohio, for Appellee. **ON BRIEF:** Joseph E. Mallon, Jeffery A. Krol, JOHNSON & KROL LLC, Chicago, Illinois, for Appellants. Curtis L. Cornett, CORS & BASSETT, LLC, Cincinnati, Ohio, for Appellee.

STRANCH, J., delivered the opinion of the court in which COLE, C.J., joined. GIBBONS, J. (pp. 16–18), delivered a separate dissenting opinion.

1

––––––––––––––––––

**OPINION**

––––––––––––––––––

STRANCH, Circuit Judge.  Five multi-employer fringe benefit funds (the Funds) of the Plumbers, Pipe Fitters & Mechanical Equipment Service, Local Union 392 (the Union), filed suit to collect delinquent employee fringe benefit contributions from B&B Mechanical Services, Inc. (B&B), an Ohio commercial plumbing contractor.  The Funds were established for the benefit of contractors' employees who perform work under a collective bargaining agreement (CBA) negotiated between the Union and the Mechanical Contractors Association (MCA) as agent for its member employers.  B&B argued that the Funds had failed to produce proof that B&B's principal independently signed the CBA, and that B&B had made ten years of contributions on a voluntary basis.  We conclude as a matter of law that B&B entered a number of written agreements setting out its obligation to contribute as required by the Labor Management Relations Act (LMRA) § 302(c)(5)(B) and is bound to pay delinquent contributions that are owed to the Funds in accordance with the terms of the CBA and the trust agreements.

Accordingly, we **REVERSE** the district court's grant of summary judgment in favor of B&B and we **REMAND** the case for further proceedings consistent with our opinion.

## I.  BACKGROUND

B&B operates in the greater Cincinnati, Ohio area.  Owners Bryan Kenny and William Williams, long-time members of the Union, first formed the entity in 2002 as an Ohio limited liability company, B&B Plumbing & Piping, LLC.  In 2006 that company merged with a corporation, B&B Plumbing & Piping, Inc.  Late in 2006, the corporate entity changed its name to B&B Mechanical Services, Inc.  Kenny serves as B&B's President and Williams serves as Secretary/Treasurer.

MCA is a mutual organization that serves as the multi-employer bargaining representative in contract negotiations with the Union.  It supports the efforts of contractors involved in plumbing, pipefitting, and mechanical equipment service who employ Union

members and it provides services in labor-management relations, industry promotion, and legislative affairs.

In August 2011, the Funds conducted an audit of B&B's records for the period January 1, 2009 through December 31, 2010. The auditor determined that B&B did not forward the correct amount of contributions to the Funds for reported employees and that B&B did not make contributions on behalf of Kenny and Williams, who performed work covered by the CBA. The Funds filed suit against B&B to recover $130,145.55 in unpaid contributions, $10,411.65 in liquidated damages, $1,689.80 in audit fees, and attorney's fees.

During the course of discovery, the Funds were unable to produce a copy of the CBA that was signed by B&B through Kenny or Williams. B&B thereafter argued that it was not bound by the CBA and did not owe the Funds any unpaid contributions for employees.

The record includes a copy of the CBA that was negotiated by MCA and the Union for the period June 1, 2006, to May 31, 2009, although other CBAs were in effect before and after those dates. B&B does not dispute that it was a member of MCA in 2009-2010, during part of the period covered by the Funds' audit, and B&B has not challenged the terms of any of the three CBAs that were in effect "through the period of time that B&B Mechanical was a member of MCA." R. 20-12, Page ID 401 at 24–25. We refer to the undisputed terms of the CBA effective June 1, 2006, to May 31, 2009, because that is the only CBA available for our review.

MCA membership required B&B to employ Union members to perform work covered by the CBA, and B&B paid dues to MCA so that the association would represent B&B's interests. Jack Bertoli, Executive Director of MCA, did not know of any contractor in the geographic area who employed union labor but did not comply with the entire CBA negotiated by MCA and the Union, whether the contractor was an MCA member or not.

The evidence, taken in a light most favorable to the Funds, establishes that, during the ten years between 2002 and 2012, B&B conducted itself as if it were bound by the CBAs negotiated between MCA and the Union. In 2002, the year Kenny and Williams formed B&B Plumbing, LLC, Kenny and B&B's surety, West American Insurance Company, executed a bond in favor of the Funds. The bond provided that B&B Plumbing, LLC had entered into a written contract

or had signed a letter of assent to be bound by the terms of a CBA negotiated between MCA and the Union, and in doing so B&B had agreed to pay its employees the current union wage scale and "to pay current contractual agreed amounts to various fringe benefit funds established under" the CBA. R. 20-17, Page ID 447. In mid-December 2006, the surety amended the bond to reflect the company's name change to B&B Mechanical Services, Inc., and shortly thereafter, B&B notified the Union of its name change by sending a copy of the bond amendment to the Union. It is undisputed that "signatory contractors" to the CBA are required to maintain such a bond to secure payment of the contributions to the Funds required by the CBA.

For ten years after executing the surety bond, B&B submitted monthly fringe benefit contributions for its union employees and the associated contribution reports to the local Funds as required by the CBA. B&B's contribution amounts matched the rates required by the CBAs that were in effect for various time periods. Each monthly contribution report submitted to the Funds included B&B's certification "that this report includes only employees covered under the terms of a collective bargaining agreement with the" Union. R. 20-8, Page ID 278; R. 21-3, Page ID 612 at 17. B&B also submitted monthly contributions and associated contribution reports to the Union's National Pension Fund. In each contribution report, B&B certified "that it is a party to a written agreement requiring contributions" to the National Pension Fund; that it "agree[d] to be bound by the terms of the Fund's Revised Standard Form of Participant Agreement and by the Fund's Agreement and Declaration of Trust"; and that the report included only employees who were covered under the terms of the CBA with the Union. R. 20-11, Page ID 391.

In March 2009, after the Union expressed interest in negotiating a new CBA, MCA sent a letter to all signatory contractors inviting them to designate MCA as the bargaining agent for contract negotiations. The letter asked the member to sign and return an attached "Appointment of Agent" form to give MCA express permission to negotiate a new CBA on behalf of the member. B&B did not return the form, but it also did not withdraw its MCA membership.

On four occasions, B&B received wage subsidies from the Union pursuant to the Union's Equality and Stabilization Program (E&S Program). The purpose of the subsidies provided by the Union was to help B&B compete against non-union contractors. In April 2008, Kenny signed a Participation Agreement on behalf of B&B acknowledging that the E&S Program is

available to "parties to the Collective Bargaining Agreement between the MCA and the Union and does not seek to impose its terms on non-signatory Contractors." R. 20-13, Page ID 415–16. The Agreement provided:

> Wages are a mandatory subject of collective bargaining between the MCA and the Union. The Program helps *signatory Contractors* to compete effectively against non-signatory Contractors and creates job opportunities for Journeymen by establishing wage subsidies with *signatory Contractors* on certain projects. The purpose of this Participation Agreement ("Agreement") is to set forth the terms and conditions that must be followed by all eligible *signatory Contractors* that seek to participate in the Program. . . .
>
> . . . As a condition to being eligible to participate in the Program, *the undersigned signatory Contractor* agrees to comply with the terms and conditions of this Agreement[.]

*Id.* (emphasis added).

On each occasion in 2008, 2010, and 2011 that B&B applied for a wage subsidy from the Union through the E&S Program, Kenny and representatives of the Union and MCA signed a Memorandum of Understanding (MOU) between the Union and MCA. Each MOU provided:

> With the exception of the foregoing changes, applicable only to the Job Name and Location stated in this Memorandum of Understanding, the Agreement of June 1, 2006, shall remain in full force and effect in accordance with its terms, and this Memorandum shall be concurrent with that Agreement, or until completion of this job.

R. 20-14 Page ID 418–21. The phrase "Agreement of June 1, 2006" is a reference to the CBA dated June 1, 2006 to May 31, 2009. Under the four MOUs, the Union approved a total of $8,260 in wage subsidies to help B&B compete against non-union employers.

Kenny denies that B&B or its legal predecessors entered into a CBA with the Union. He further denies that B&B expressly authorized MCA to engage in collective bargaining with the Union on behalf of B&B. He concedes that B&B traditionally hired union employees and used the Union's hiring hall twice in 2007, but he denies that he had any intent to bind B&B to the CBA when he requested union employees through the hiring hall. Because B&B employed union workers, Kenny and Williams believed that it was appropriate for B&B to make contributions to the Funds on behalf of the union employees, even though B&B was not bound

by the terms of the CBA.  His assertion that B&B acted voluntarily in making contributions to the Funds for ten years, however, conflicts with his statement that Union officials required B&B to make the contributions and submit the contribution reports to the Funds.  According to Kenny, the Union supplied B&B with forms already filled in with the required contribution rates so that B&B only had to add its employees' names and the number of hours each employee worked.  By completing the forms, Kenny explains, B&B did not intend to bind itself to the CBA.  B&B stopped making any contributions after the Funds conducted the audit of B&B's records in 2011.

On cross-motions for summary judgment, the district court ruled in favor of B&B, holding the Funds failed to produce evidence to prove that B&B signed the CBA or entered into any written agreement binding B&B to the CBA.  The court subsequently denied the Funds' motion to alter or amend the judgment under Federal Rule of Civil Procedure 59(e).  The Funds now appeal from the district court's Opinion & Order denying the Rule 59(e) motion.

## II.  STANDARD OF REVIEW

The denial of a Rule 59(e) motion is ordinarily "reviewed for an abuse of discretion, but where a Rule 59(e) motion seeks reconsideration of a grant of summary judgment, as it did here, we conduct a *de novo* review."  *Nat'l Leadburners Health & Welfare Fund v. O.G. Kelley & Co.*, 129 F.3d 372, 374 (6th Cir. 1997).  We will affirm a grant of summary judgment if the evidence, taken in the light most favorable to the non-moving party, demonstrates that there are no genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. *Cent. States, Se. & Sw. Areas Pension Fund v. Gen. Materials, Inc.*, 535 F.3d 506, 508 (6th Cir. 2008).

## III.  ANALYSIS

Well-settled principles of law aid us in resolving this appeal.  Both the Employee Retirement Income Security Act (ERISA) and the LMRA require that agreements concerning employee fringe benefit plans be maintained in writing in order to avoid misunderstandings and prevent abuse.  One of ERISA's "core functional requirements" is that each "employee benefit plan shall be established and maintained *pursuant to a written instrument*."  *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83 (1995) (quoting 29 U.S.C. § 1102(a)(1)).  Every

employee benefit plan must "specify the basis on which payments are made to and from the plan," 29 U.S.C. § 1102(b)(4), and "[t]he plan administrator is obliged to act 'in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with'" ERISA provisions. *Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*, 555 U.S. 285, 300 (2009) (quoting 29 U.S.C. § 1104(a)(1)(D)).

Written plans are necessary because LMRA § 302(a) generally bars employers from contributing money or a thing of value to representatives of employees. 29 U.S.C. § 186(a). This statutory prohibition exists to prevent the misappropriation or dissipation of money that is owed to union employees. *Cent. States, Se. & Sw. Areas Pension Fund v. Behnke, Inc.*, 883 F.2d 454, 459 (6th Cir. 1989). To protect fringe benefits, an exception exists in § 302(c)(5)(B) of the LMRA authorizing employers to make contributions to trust funds established by employee representatives "for the sole and exclusive benefit of the employees," if "the detailed basis on which such payments are to be made is specified in a written agreement with the employer." 29 U.S.C. § 186(c)(5)(B).

Under such written agreements, the multi-employer fringe benefit trust funds become third-party beneficiaries and, under § 515 of ERISA, they may rely on the literal terms of the written agreements. 29 U.S.C. § 1145; *Operating Eng'rs Local 324 Health Care Plan v. G & W Constr. Co.*, 783 F.3d 1045, 1051 (6th Cir. 2015). Section 515 protects and streamlines a trust fund's ability to collect an employer's delinquent contributions owed to an ERISA employee benefit plan by limiting the employer's assertion of "unrelated" or "extraneous" defenses, *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 88 & n.12 (1982), and by rendering immaterial the actual intent of the bargaining parties or any understandings those parties may entertain separate and apart from the written agreements. *Bakery & Confectionery Union & Indus. Int'l Health Ben. & Pension Funds v. New Bakery Co.*, 133 F.3d 955, 959 (6th Cir. 1998). Thus, § 515 "increases the reliability" of the income stream of multiemployer funds, "reduces the cost and delay associated with collection actions, and reduces or eliminates the cost of monitoring the formation of collective bargaining agreements." *Id.* (quoting *Bakery & Confectionery Union & Indus. Int'l Pension Fund v. Ralph's Grocery Co.*, 118 F.3d 1018, 1021–22 (6th Cir. 1997)).

In this circuit, we apply a longstanding rule that the "written agreement" required by LMRA § 302(c)(5)(B) does not have to be a CBA as long as the written agreement "sets out the employer's obligation to contribute" to the employee benefit funds. *Behnke, Inc.*, 883 F.2d at 459 (quoting *Cent. States Se. & Sw. Areas Pension Fund v. Kraftco, Inc.*, 799 F.2d 1098, 1111 n.16 (6th Cir. 1986)). In fact, the employer does not have to sign the written agreement to be bound by it because § 302(c)(5)(B) "does not specify any signature requirement." *O.G. Kelley & Co.*, 129 F.3d at 375. The reduction of the agreement to writing satisfies § 302(c)(5)(B) because the statute requires "a written agreement to which an employer is bound, not a written agreement to which an employer is bound which also carries that employer's signature." *Id.* at 376.

The conclusion of *O.G. Kelley & Co.* that § 302(c)(5)(B) does not require an employer's signature on the written agreement "coheres with a well-developed body of law allowing employer associations to bind employer members to collective bargaining agreements." *Id.* at 375. In *Trustees of U.I.U. Health & Welfare Fund v. N.Y. Flame Proofing Co.*, 828 F.2d 79, 83 (2d Cir. 1987), the Second Circuit held that membership in an employers' association like MCA bound an employer to a CBA requiring employer contributions to trust funds if the principal activity of the employers' association is negotiation of CBAs on behalf of its members "and if the longstanding, universally observed and universally known custom is that members are bound by such agreements." Under those circumstances, acquiring membership in the employers' association constitutes "an unequivocal statement as to [the association's] actual authority to bind the new member." *Id.* In this case, B&B does not dispute the testimony of MCA's Executive Director, Jack Bertoli, that labor contract negotiation is a principal function of MCA and that Bertoli did not know of any contractor employing Union labor in the Cincinnati area that did not comply with the CBA negotiated by MCA and the Union, whether that contractor was an MCA member or not. The *O.G. Kelley & Co.* court also cited the Fifth Circuit's decision in *NLRB v. Beckham, Inc.*, 564 F.2d 190 (5th Cir. 1977), which concluded that the employers' association had apparent authority to bind an employer in labor contract negotiations where the employer participated in the negotiations with knowledge that the association would bind all members, even though the employer refused to sign the CBA at the conclusion of the negotiations. *O.G. Kelley & Co.*, 129 F.3d at 375–76.

We have held that § 302(c)(5)(B) is satisfied if the "written agreement" binding an employer to make contributions to trust funds is signed by the contractors' association on behalf of the employer, even if the employer did not give the association express written authority to act on its behalf. *United Ass'n of Journeymen & Apprentices of the Plumbing & Pipefitting Indus. of the U.S. & Canada, Local Union 816 v. Herb Phillips Plumbing & Heating of Bay City, Inc.*, No. 91-1216, 1991 WL 225555, at *1–2 (6th Cir. Nov. 4, 1991). Our decision rested on "hornbook law that an agent can bind a principal to a written contract—even where the contract itself must be in writing—whether or not the agent's authorization to do so is itself in writing." *Id.* at *3 (citing Restatement (Second) of Agency § 30). *O.G. Kelley & Co.* and *Herb Phillips* thus stand for the principle that an employer may be bound by a CBA negotiated by an MCA and a Union even though the employer did not sign the CBA or provide express written authority to the MCA to negotiate on its behalf.

Our decision in *Merrimen v. Paul F. Rost Electric, Inc.*, 861 F.2d 135 (6th Cir. 1988), is inapposite. That case addressed a narrow situation where an provision of a CBA expressly required the employer to sign a letter of assent before the employer could be bound by the CBA. *Id.* at 136. Although the employer maintained membership in an employer association and voluntarily made pension contributions for employees for a period of time, the employer did not sign the mandatory letter of assent despite promises to do so. *Id.* at 136–37. Because the CBA expressly required the employer's signature on a letter of assent, we declined to hold the employer bound to the CBA by conduct alone. *Id.* at 139.

We confirmed in *O.G. Kelley & Co.* that the *Merrimen* court had no occasion to decide whether a CBA negotiated by a multi-employer association but not signed by an individual employer satisfied the "written agreement" requirement of LMRA § 302(c)(5)(B). 129 F.3d at 374. Because § 302(c)(5)(B) permits an employer to make contributions to an employee trust fund if "the detailed basis on which such payments are to be made is specified in a written agreement with the employer," we concluded that interpreting the statute not to require the employer's signature on the written agreement comported with the legislative purpose. *Id.* at 375.

Similarly, in *Herb Phillips Plumbing & Heating*, 1991 WL 225555, at *2, we discouraged a broad reading of *Merrimen*. In *Herb Phillips*, the CBA did not require the members of a contractors' association to sign letters of assent in order to be bound to the CBA, and under ordinary agency principles "the association's president was authorized to execute the agreement for and on behalf of the individual employers who were members of the association." *Id. See also NLRB v. I&F Corp.*, No. 97-6289, 1999 WL 777646, at *3 (6th Cir. Sept. 17, 1999) ("In multiemployer bargaining, employers pool their resources and bargaining strength by authorizing a committee, such as the Association, to bargain with a union on their behalf, then to execute a CBA"). Importantly, we concluded in *Herb Phillips* that the "written agreement" requirement of § 302(c)(5)(B) was satisfied by the association's entry into a written agreement with the union on behalf of its members:

> Section 302(c)(5)(B) does not say that an employer's agent needs written authorization to sign contracts for the employer. The purpose of § 302 is simply "to insure that employer contributions are only for a proper purpose and to insure that the benefits from the established fund reach only the proper parties."

*Id.* (quoting *Moglia v. Geoghegan*, 403 F.2d 110, 116 (2d Cir. 1968)). "This purpose hardly suggests that we can or should impose a non-statutory requirement with respect to the form of the agent's authority." *Id.* The written CBA signed by the association as the employer's agent "clearly satisfie[s] the 'written agreement' requirement of § 302(c)(5)(B), and the [CBA] was clearly sufficient to satisfy the anti-fraud purposes of § 302." *Id.*

Having examined the tenets of ERISA and the LMRA and the principles of law flowing from their provisions, we now turn to the question before us—whether B&B is required to make contributions to the Funds. We examine the various writings of record in this case in light of our precedent and the longstanding rule that the "written agreement" required by LMRA § 302(c)(5)(B) does not have to be a CBA as long as the written agreement "sets out the employer's obligation to contribute" to the employee benefit funds. *Behnke, Inc.*, 883 F.2d at 459 (quoting *Kraftco, Inc.*, 799 F.2d at 1111 n.16).

## A. The Collective Bargaining Agreement

Applying these legal principles to the undisputed facts before us, we conclude that B&B is bound by the written CBA negotiated between MCA and the Union to make contributions to

the Funds on behalf of B&B's union workers, though neither Kenny nor Williams signed the CBA. The Union and MCA negotiated the CBA, set down its terms in writing, and representatives of both the Union and MCA signed the CBA. Under *O.G. Kelley & Co.*, § 302(c)(5)(B) imposes no requirement that B&B independently sign the CBA in order to be bound by that written agreement to make contributions to the Funds. 129 F.3d at 375–76. MCA acted as B&B's agent when it negotiated and signed the CBA. *Id.*; *Herb Phillips Plumbing & Heating of Bay City, Inc.*, 1991 WL 22555, at *2–3. It is of no legal consequence that B&B now argues it did not give MCA express written consent to act as its agent to bind it to the CBA. *See Herb Phillips Plumbing & Heating of Bay City, Inc.*, 1991 WL 225555, at *3 ("Section 302(c)(5)(B) does not say that an employer's agent needs written authorization to sign contracts for the employer.").

Bound by the CBA, B&B is an "employer" under that agreement and required to make contributions to the trust funds for union employees. The Preamble to the CBA provides:

> This document is a collective bargaining agreement between the Union and Employer Association entered into for the purpose of establishing the wages, benefits, terms and conditions of employment of the employees of *any employer represented by the Employer Association* and/or any employer who signs this agreement[.]

R. 20-4, Page ID 226 (emphasis added). The CBA further provides that, "[u]pon the execution of this agreement by both parties [the Union and MCA], through their committees appointed for these purposes, this agreement shall be binding upon the Union *and the employers* and upon all employees thereof." *Id.*, CBA Article I, § 2 (emphasis added). The CBA defines an "employer" as "a Plumbing, Heating, Piping, Air Conditioning or Refrigeration Contractor, which is a . . . corporation . . . engaged in the plumbing, heating, piping, air conditioning or refrigeration business; is recognized as such in any one or combination of the above trades; conducts a regular shop for this express purpose, and employs journeymen and/or apprentices, under this agreement." *Id.* at 226–27, CBA Article II, § 1. B&B thus was an "employer" bound by the CBA during the time B&B was an MCA member in 2009–2010, the period covered by the Funds' audit. Because MCA negotiated the CBA with the Union as the agent of employer members, B&B is bound by the CBA's provisions to make contributions to the Funds. *See Behnke, Inc.*, 883 F.2d at 459; *O.G. Kelley & Co.*, 129 F.3d at 375; *Herb Phillips Plumbing*

*& Heating of Bay City, Inc.*, 1991 WL 225555, at *2–3. *Merrimen* does not control because the CBA here did not expressly require a signature of Kenny or Williams in order to bind B&B to the provisions of the CBA. B&B is bound by the CBA because MCA represented B&B as an agent in the CBA negotiations and because B&B is an "employer" under the express language of the CBA.

**B. The Trust Fund documents**

B&B is also bound to make employee contributions to the Funds under the applicable trust documents. Section 1.2 of the trust document governing the Health and Welfare Fund provides in part that "[t]he term 'Collective Bargaining Agreement' shall mean any written contract by and between the Employer as defined in Section 1.4 of this Article and the Union as defined in Section 1.12 of this Article." R. 21-2, Page ID 546. Section 1.4 defines the term "Employer" in part to "mean the Mechanical Contractors Association of Cincinnati and the members thereof." *Id.*, Page ID 547. Section 1.5 of the trust document further provides in part that "[t]he term 'Employer Contributions' shall mean payments made or to be made to this Trust Fund by an Employer under the provisions of a collective bargaining agreement as defined herein." *Id.* at 548 (emphasis added).

> Likewise, § 6.1 of the trust document governing the Pension Fund provides:
>
> Any Employer who is required to contribute to the Fund by the provisions of a Collective Bargaining Agreement with the Union shall become a part of this Trust Fund (and the employees of said Employer shall be eligible to participate therein) upon the said Employer making the required contribution to the Trust Fund, unless such participation is clearly contrary to the stated purposes of this Fund.

R. 21-2, Page ID 602. Section 1.3 of the trust document further states in part that "[t]he term 'Employer' shall mean the Mechanical Contractors Association of Cincinnati and the members thereof." *Id.*, Page ID 586 (emphasis added).

Because B&B is an "employer" under the trust documents governing the Health and Welfare Fund and the Pension Fund, B&B is bound to make contributions to those Funds on behalf of union employees.

**C. Other written agreements**

Finally, B&B executed other written agreements promising to make contributions to the Funds on behalf of union employees that satisfy the LMRA's requirement that a written agreement "set[] out the employer's obligation to contribute" to the employee benefit funds. *Behnke, Inc.*, 883 F.2d at 459 (quoting *Kraftco, Inc.*, 799 F.2d at 1111 n.16).

In 2002, B&B purchased and executed a surety bond in favor of the Funds titled "The United Associates of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of U.S. and Canada Local Union #392 Fringe Benefit Funds and Employee Authorized Deductions Bond" and maintained it through the years. The bond provided that B&B Plumbing, LLC had entered into a written contract or had signed a letter of assent to be bound by the terms of a CBA negotiated between MCA and the Union. The bond confirmed in writing that B&B is bound by the written CBA to "pay current contractual agreed amounts to various fringe benefit funds established under said agreement[.]" R. 20-17, Page ID 447–48. After revising the bond in 2006 to reflect a company name change, B&B sent a copy of the amended bond to the Union, thereby reaffirming its obligation to make contributions to the Funds pursuant to the CBA. R. 20-5, Page ID 262.

On a monthly basis for ten years, B&B also submitted contributions and contribution reports to the Funds as required by the CBA. Each monthly contribution report listed the employees covered by the CBA for whom contributions were being made and included B&B's certification "that this report includes only employees covered under the terms of a collective bargaining agreement with the" Union. R. 20-8, Page ID 278; R. 21-3, Page ID 612 at 17. B&B also certified in the contribution reports sent to the National Pension Fund that it was "a party to a written agreement requiring contributions." R. 20-11, Page ID 391. *See Mich. Bricklayers & Allied Craftsmen Health Care Fund v. Nw. Constr., Inc.*, Nos. 95-2379, 96-1346, 1997 WL 351296, at *1 (6th Cir. June 23, 1997) (holding employer bound to the terms of an expired CBA when it continued to submit contribution report forms and payments, continued to make payroll deductions for union dues under the terms of the expired CBA, and increased the amount of payroll deductions in accordance with the terms of the new CBA before it was signed).

Although our court held in *Central States, Southeast & Southwest Areas Pension Fund v. General Materials, Inc.*, that certification clauses in contribution reports alone were not sufficient evidence to bind the employer to an expired CBA under the facts of that case, 535 F.3d at 509–10, in this case, the certification clauses in the contribution reports are coupled with written agreements binding B&B to an unexpired CBA requiring contributions to the Funds. *See Bricklayers Local 21 of Ill. Apprenticeship & Training Program v. Banner Restoration, Inc.*, 385 F.3d 761, 771 n.9 (7th Cir. 2004) ("[C]ertification language is significant, and may be sufficient, to the extent that it *incorporates* other written agreements with the employer—such as a collective bargaining agreement or trust agreements—which . . . set forth the 'detailed basis' for payments as required by section 302(c)(5)(B).").

Finally, B&B applied to the Union for and received wage subsidies on four occasions from 2008 through 2011 under the Union's Equality and Stabilization Program. Kenny signed participation agreements acknowledging that the program was designed to help union contractors compete with non-union contractors. R. 20-13, Page ID 415–16. He also signed MOUs providing that, with the exception of the wage changes permitted by the subsidy program, the CBA "shall remain in full force and effect in accordance with its terms, and this Memorandum shall be concurrent with that Agreement, or until completion of this job." R. 20-14 Page ID 418–21. Consequently, Kenny acknowledged each time B&B accepted wage subsidies from the Union that B&B was bound by the terms of the CBA to make contributions to the Funds.

## IV.  CONCLUSION

B&B argues that it does not owe any contributions to the benefit Funds because it did not independently sign the CBA and merely made ten years of "voluntary" contributions to the Funds. Such contributions—absent the requisite "written agreement"—are illegal under LMRA § 302. S*ee Merrimen*, 861 F.2d at 137. But we need not address whether B&B's multi-year contributions to the Funds are void for illegality because the undisputed evidence supports the conclusion that B&B executed written agreements binding itself to the CBA's fringe benefit obligations. Following ample precedent under ERISA and the LMRA, we enforce the written agreements binding B&B to make contributions to the Funds. Because we conclude under LMRA § 302(c)(5)(B) that B&B is bound by a "written agreement" requiring it to make

contributions to the Funds, we also need not decide whether an employer's course of conduct alone is sufficient to demonstrate that the employer is bound to a written agreement requiring the payment of contributions. *Cf. Mich. Bricklayers & Allied Craftsmen Health Care Fund*, 1997 WL 351296, at *1.

Accordingly, we **REVERSE** the decision of the district court and **REMAND** the case for further proceedings consistent with this opinion.

_____

**DISSENT**

_____

JULIA SMITH GIBBONS, Circuit Judge, dissenting.  Because I believe that there are genuine issues of material fact as to whether B&B intended to be bound by the CBA, I respectfully dissent.  After properly concluding that the "written agreement" contemplated by § 302(c)(5)(B) of the LMRA need not be a CBA nor need it contain an employer's signature, the majority lists multiple writings, including the CBA itself, the trust fund documents, the surety bond, monthly contribution reports, and wage subsidy receipts, which it feels satisfy § 302(c)(5)(B) and bind B&B to contribute to the Funds as a matter of law.  This conclusion, in my opinion, ignores factual insufficiencies in the record and overstates the independent legal effect of some of the writings.

First, the majority presupposes that B&B was a member of the MCA at the time it negotiated the CBA.  Based on this presupposition, it concludes that the MCA had actual authority to bind B&B to the CBA.  Other than the testimony of the MCA's Executive Director that MCA had a relationship with B&B's predecessors, however, there is no evidence suggesting that, prior to October 2009, B&B was a member of the MCA.  Even the Funds note B&B did not become a formal member of the MCA until October 2009.  What is more, the MCA's executive director testified that he has never received an agreement appointing MCA as B&B's agent in CBA negotiations.  When viewing these facts in the light most favorable to B&B, there is a genuine question of material fact as to whether the MCA was acting as B&B's agent while it negotiated the relevant CBAs, and thus, whether B&B was or ever intended to be bound by the CBA.

The majority next concludes that the Health and Welfare Trust Fund Agreement satisfies § 302(c)(5)(B)'s "written agreement" requirement and binds B&B to the CBA.  However, this argument also presupposes that B&B was a member of the MCA when it negotiated the CBA.  As the majority notes, the trust agreement defines "Employer" as "the Mechanical Contractors Association of Cincinnati and the members thereof," and the agreement only includes those employers who "[are] required to contribute to the Fund by the provisions of a Collective

Bargaining Agreement with the Union." Because I believe there is a question of fact about B&B's membership in the MCA, I do not think that the trust agreement independently establishes B&B's obligation to contribute to the Funds as a matter of law. I would also note that the trust agreement was executed on February 15, 2001, and amended on March 1, 2001, but that B&B's initial predecessor was not formed until 2002. It would strain credulity to hold that a trust agreement last executed before B&B or its predecessors ever existed can somehow serve as an independent basis to bind B&B to the CBA.

The majority next turns its focus to the monthly contribution reports B&B sent to the Funds for nearly a decade. The reports reference B&B's obligations under the CBA, but, as the majority correctly points out, the certification clauses in the reports, standing alone, are insufficient to bind B&B to the CBA. *See Central States, Southeast & Southwest Areas Pension Fund v. General Materials, Inc.*, 535 F.3d 506, 509–10 (6th Cir. 2008); *Dugan v. R.J. Corman R. Co.*, 344 F.3d 662, 668 (7th Cir. 2003) (noting that contribution report language was "weak evidence" of the employer's obligations under the CBA); *see also Firesheets v. A.G. Bldg. Specialists, Inc.*, 134 F.3d 729, 731–32 (5th Cir. 1998) (noting that "the existence of some boilerplate language on the record-keeping documents for the contributions does not bind [the employer]"). For the same reasons, the surety bond B&B purchased in 2002 and revised in 2006 cannot independently bind B&B to the CBA. Like the contribution reports, the bond contains language referencing B&B's obligations under the CBA. However, when the record as a whole shows a genuine issue as to the employer's intent to be bound by a CBA, writings with boilerplate references to the CBA should not be independently sufficient to establish, as a matter of law, that an employer is bound under the CBA. *See Dugan* 344 F.3d at 668 (noting that "boilerplate will sometimes be irrelevant to the document in which it has been unthinkingly inserted").

Finally, the majority casts B&B's receipt of wage subsidies under the Union's Equality and Stabilization Program as further evidence of B&B's obligations under the CBA. However, the terms of the E&S agreement dictate that the program does not serve to bind contractors who are not already parties to the CBA. The agreement expressly provides: "The Program only

effects [sic] parties to the Collective Bargaining Agreement between the MCA and the Union and does not seek to impose its terms on non-signatory Contractors."

On my reading of the record, it remains an open question whether B&B intended to be bound or was ever in fact bound by the CBA. Therefore, I respectfully dissent. I would remand the case to the district court for trial.